[Crim. No. 22090. Oct. 23, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
LUIS VALENZUELA RODRIGUEZ, Defendant and Appellant.

734

**COUNSEL**

Dennis P. Riordan, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Ann K. Jensen, Linda Ludlow, Ronald S. Matthias and Nathan D. Mihara, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GRODIN, J.**—Luis Valenzuela Rodriguez appeals from a judgment of death imposed for the first degree murders of California Highway Patrol Officers William H. Freeman and Roy Paul Blecher on December 22, 1978. The jury found that appellant had personally used a firearm in both murders (Pen. Code, § 12022.5)[1] and, as special circumstances justifying the death penalty, that he was convicted of more than one murder (§ 190.2, subd. (a)(3)) and that both victims were peace officers intentionally killed while in the performance of their duties (§ 190.2, subd. (a)(7)). The crimes were committed in Yolo County, but pursuant to appellant's motion for change of venue, the case was transferred to San Mateo County for trial.

We find no prejudicial error in the guilt phase of appellant's trial and will therefore affirm the convictions, as well as the allegations and special circumstances found true by the jury. Similarly, we will reject all but one of appellant's challenges to the penalty phase, including his several attacks on the constitutionality of the 1978 death penalty law. We will conclude, however, that in deciding the automatic application for modification of the death verdict (§ 190.4, subd. (e)), the trial judge failed to make an independent determination whether the death penalty was proper under the law and evidence, as the statute requires. We will therefore vacate the penalty judgment and remand to the trial court solely for a reconsideration of the modification application under the principles set forth in this opinion.

## I. GUILT PHASE

### A. *Evidence of Guilt*

About 3:40 a.m. on December 22, 1978, two witnesses situated near the crossing of Harbor Boulevard over Interstate 80 in West Sacramento heard gunshots and saw red and other lights on the freeway. One of the witnesses, a deputy sheriff, drove onto the freeway to investigate. He discovered a California Highway Patrol cruiser parked by itself on the eastbound shoulder. The vehicle's forward red light, right blinkers, and right spotlight

---

[1]All section references are to the Penal Code unless otherwise indicated.

were illuminated, but the headlights were off. The right front door was open. The lifeless bodies of Officers Freeman and Blecher were lying to the right of the car.

The principal witness against appellant was Margaret Klaess, who testified that appellant was the driver and she the sole passenger in a stolen car when it was stopped by the highway patrol at the time and place of the crimes. She stated that she saw appellant get out of the car, heard shots, and later was told by appellant about his struggling with the officers, handcuffing one of them, and shooting him in the head.

Klaess met appellant in January 1978 and lived with him intermittently throughout that year. About the end of November they moved into the Bel Air Motel in West Sacramento. Shortly thereafter they were arrested by the Richmond police, who impounded appellant's panel truck.

On December 20 they began hitchhiking from West Sacramento to Richmond in order to redeem the truck, planning to obtain the $70 for impoundment charges through robbery. At Davis they were picked up by the owner of a new Jeep pickup truck. Appellant displayed a gun and, at Vallejo, forced the host driver to hand over his wallet and get out, whereupon they drove to Richmond and abandoned the truck.

Next day a friend drove them from Richmond to Vallejo, where appellant obtained a temporary driver's license under a false name. Klaess and appellant then went to two used-car lots where they absconded with used cars under the pretext of test driving them. They left the first car, a Volkswagen Beetle, at the second lot, where they obtained a 1977 dark brown Camaro. They drove it to San Francisco, where appellant went to the front door of a house and robbed the occupant of money at gunpoint. From San Francisco they drove to Sausalito and offered a ride to a woman prostitute, who got in the car. In an industrial area of San Rafael they came to a stop; appellant pulled out a gun and forced the woman to surrender money and jewelry; and Klaess rifled the woman's purse.

After buying a pint of 151 proof rum, the pair drove to the house of their friend in Richmond, and then to the home of a second friend, Jeri Engel, in Crockett. Engel testified that Klaess was drunk when she arrived. After a while Engel and appellant went to a local bar where they purchased cocaine. Returning to Engel's house, they shared the cocaine with Klaess and with Engel's boyfriend.

Klaess and appellant then left Crockett for West Sacramento. The time of their departure is sharply disputed; Engel testified it was 2:30 a.m.

Klaess slept until they had passed Vallejo. Appellant was driving faster than most of the traffic on the foggy freeway. As they neared Sacramento, appellant said, "Oh, shit, we're getting red lighted," and pulled over to the shoulder. An officer appeared at the driver's window and asked appellant to step outside; he complied. Klaess heard voices at the rear of the Camaro and then, about two minutes after appellant's exit, a shot from the right rear. She looked out the passenger window and saw an officer lying in the ice plant, about 20 feet from the Camaro and about even with its front wheels, calling for help. Klaess slumped down in the seat below the window. Appellant reappeared at the driver's side, acting nervous, and said that he could not find "the license." Immediately, he left again and Klaess heard a shot, followed by a series of shots. Appellant reappeared in half a minute and said in a panicky voice that he could not find the license or "the gun." He left a third time and returned in 20 or 30 seconds with two silver revolvers, which were put in Klaess's purse.

Appellant then drove the Camaro off the freeway and parked near some apartments. They wiped off fingerprints, then proceeded on foot to the Bel Air Motel, sliding down a muddy embankment. On the way, they disposed of the two silver revolvers in a dumpster.

Appellant's "Lee" brand pants, found at his motel room on December 24, were wet and muddy and had human blood on the left rear upper leg. According to Klaess, appellant was wearing "Lee" brand pants when they left Crockett.

Immediately after discovery of the crimes, investigators found appellant's temporary driver's license on the ground near the highway patrol car. Also on the ground was a footprint of the heel and sole pattern of the brand of shoe (Famolare) worn by appellant at the time of his arrest on December 24. Several witnesses who were at the scene denied having worn that brand of shoe.

The victims had each carried a .38 revolver issued by the highway patrol. Neither gun was ever found, but the bullets found at the scene appeared to have been fired by them. Bullets fired into Freeman's elbow, torso and head came from one of those guns; bullets fired into Freeman's left shoulder and into the head of Blecher (who was handcuffed) came from the other.

Two weapons were lying on the ground. One was an empty .38 revolver that Blecher carried as a backup weapon, and the other was a .22 revolver, introduced as exhibit 6. Klaess testified that she had seen exhibit 6 in appellant's possession at the Bel Air Motel and that he carried a gun on

his person throughout the three robberies and the visit to Engel's home immediately preceding the killings. Of the three robbery victims, one said that the gun used was shinier than exhibit 6 but otherwise similar; another said that the gun used was similar in color only shinier; a third said the gun used was similar but with a slightly larger barrel. Yet none of these witnesses testified that exhibit 6 was *not* the gun used by appellant.

Several witnesses, including friends with whom appellant had socialized earlier in 1978, testified to hearing him repeatedly express hatred of police and threaten to kill any police who would attempt to arrest him. A woman with whom appellant had a romantic relationship in the fall of 1978 (while he was estranged from Klaess) testified that on several occasions he declared he did not like police and that if faced with arrest by police officers he would "blow them away." She further testified that in mid-November a Sacramento police officer stopped her car, which was being driven by appellant with her as a passenger. As the officer approached and appellant was slowing to a stop, he muttered an obscenity, said, "We're going to get busted," and reached for a sawed-off shotgun that was in the back seat. She pushed his hand away, covered the gun with her coat, and told him he was "crazy." During the traffic stop, she asked random questions to distract the officer from appellant's anger. After the officer left, she remonstrated that "getting a ticket is no big thing" and is not a reason to reach for a gun. Appellant tore up the ticket and said, "I don't want to get busted."

In addition to Klaess's testimony of appellant's admissions of participation in the murders, there was evidence that on December 23 appellant told a friend that he had "downed a couple of them [policemen]" and told a business partner, who mentioned burglar alarm problems, that he (appellant) had done something so "heavy" that the burglar alarm problems would seem like nothing. (Though the friend denied the incident while testifying, evidence was introduced of his describing it to the police while in custody.)

Appellant and Klaess were arrested in or near Richmond during the early morning hours of December 24 and charged with the murders of Officers Freeman and Blecher.

B. *Guilt Phase Defense*

Appellant testified in his own behalf. Though denying participation in the murders, he admitted most of the events of December 20 and 21 testified to by Klaess. Thus, he admitted the following: On December 20, he and Klaess, while hitchhiking from West Sacramento to Richmond, robbed the driver who picked them up in Davis of both his wallet and his pickup

truck, which they abandoned in Richmond. Next day appellant obtained a temporary driver's license under a false name, and he and Klaess absconded with the two used cars in Vallejo. They drove in the stolen Camaro to San Francisco, where appellant robbed a resident at the latter's front door. They committed the robbery against the woman hitchhiker in San Rafael.

Appellant testified, however, that the weapon he used in the robberies was a .38 caliber handgun belonging to Klaess, which she kept in her purse, and which he returned to her after each robbery. He denied owning a handgun at that time and denied recognizing exhibit 6, the .22 caliber revolver found at the crime scene.

Appellant also described his visit, along with Klaess, to the home of Jeri Engel in Crockett late in the evening of December 21. The most important difference between his account of that visit and that of the prosecution witnesses was his testimony that he and Klaess departed Crockett for West Sacramento at 1:30 a.m. rather than at 2:30 a.m. To corroborate his version of the time, he called two witnesses who testified to seeing him and Engel at the bar in Crockett no later than midnight. He also called Wanda Hawthorne, who testified that she and a friend were driving from San Francisco to Sacramento that night and noticed a brown Camaro, with driver and one passenger, which followed the Hawthorne car between Vacaville and Davis. She stated she first noticed the Camaro about 2 a.m., but also testified that she left San Francisco at 1:30 a.m. and arrived at her friend's home in Sacramento about 3:45 a.m.

Appellant testified that he and Klaess drove from Crockett to West Sacramento without incident, thus contradicting Klaess's testimony of their being stopped by the highway patrol. He further testified as follows: He parked the Camaro two or three blocks from the Bel Air Motel, intending to abandon it, with the keys left in the ignition switch. Klaess demanded that instead of returning to their motel room they find some more cocaine. Appellant refused, and Klaess drove off in the Camaro while he returned to the motel on foot. When he awoke next morning about 7:30, he saw Klaess in the motel room. There was mud and a pair of dirty pants in the bathroom. Klaess acted nervous and said that appellant would have to say she was with him all night. When asked why, she said she had been "with some people," and added, "I can't tell you, they'll kill me."

Appellant admitted that the temporary driver's license found at the scene of the crime was the one he had obtained in Vallejo on December 21. He asserted, however, that because he had no wallet, the license was kept in Klaess's purse. He said that when he found Klaess in the motel room on

awakening the next morning, that purse, as well as a coat and sweater she had worn the day before, were missing.

Appellant denied wearing "Lee" brand pants on the trip from Crockett. He said he had one pair of such pants and had put them in the dirty clothes bag several days earlier. He could not explain the blood on them. He also denied wearing his Famolare shoes (consistent with footprints found at the crime scene) on that day.

Appellant also denied making statements threatening the police or expressing hostility toward police. He denied the presence of any shotgun in the car during the Sacramento traffic stop at which a prosecution witness said he had reached for a shotgun in the back seat. He freely admitted other details of the stop.

Militating against the credibility of Klaess was evidence that her testimony was being given under a plea bargain with the district attorney. In exchange for her testifying truthfully against appellant and pleading guilty to being an accessory after the fact to the murders (§ 32), thus exposing herself to a maximum prison sentence of three years (§§ 18, 33), she was given immunity from prosecution not only for the murders themselves but also for all crimes preceding the murders.

Moreover, while in jail after her arrest and before deciding to give information against appellant to the authorities, she received a misdirected letter, written by appellant but addressed to another woman with whom appellant was romantically involved. She reacted with anger and jealousy and with a disinclination to "stick up for him" any further.

Klaess admittedly hated police officers and had expressed those feelings to appellant, though he never heard her threaten to kill them. She was acquainted with one Robert Sanchez, who at the time of the killings had acquired a white Ford Galaxy.

A number of motorists testified, both for the defense and in prosecution rebuttal, concerning their observations of a California Highway Patrol car parked alongside the freeway at the time and place of the killings. One such witness said that a light-colored car that could have been a Ford Galaxy was parked near the patrol car; two others said they had seen what might have been a light-colored Ford Fairlane; still another claimed to have seen a white Nova. Those four witnesses were outnumbered, however, by others who testified that the patrol car was accompanied by various vehicles of entirely different descriptions.

## C. *Death Qualification as Depriving Appellant of Representative Cross-section of Community*

On voir dire, at least one prospective juror was excused for cause because of his inability to vote to impose the death penalty under any circumstances. Appellant argues that elimination of such a juror deprived him of his right to a jury representative of a cross-section of the community. We have consistently rejected similar contentions. (E.g., *People* v. *Chavez* (1985) 39 Cal.3d 823, 827 [218 Cal.Rptr. 49, 705 P.2d 372]; *People* v. *Anderson* (1985) 38 Cal.3d 58, 60 [210 Cal.Rptr. 777, 694 P.2d 1149]; *People* v. *Holt* (1984) 37 Cal.3d 436, 449 [208 Cal.Rptr. 547, 690 P.2d 1207]; *People* v. *Zimmerman* (1984) 36 Cal.3d 154, 160-161 [202 Cal.Rptr. 826, 680 P.2d 776]; *People* v. *Fields* (1983) 35 Cal.3d 329, 353, 374 [197 Cal.Rptr. 803, 673 P.2d 680], cert. den. (1984) 469 U.S. 892 [83 L.Ed.2d 204, 105 S.Ct. 267].) For federal purposes, the United States Supreme Court recently resolved the issue against appellant. (*Lockhart* v. *McCree* (1986) 476 U.S. —, — [90 L.Ed.2d 137, 148-150, 106 S.Ct. 1758].) We see no reason to reexamine it in the present case.

### D. *Cross-examination About Drug Use and Psychiatric Treatment*

■ Appellant contends he was deprived of his right to cross-examination by the court's refusal to allow his counsel to interrogate Klaess concerning her history of drug use and psychiatric treatment.

Klaess was born September 30, 1960. At appellant's preliminary hearing she testified as follows: She first used PCP, or angel dust, when she was about 14 and last used it at age 15 when she had "a really bad experience with it." She was hospitalized three times, for overdoses of PCP, at "a private hospital for teenagers with drug problems and running away problems." She denied experiencing any further effects of PCP, though her doctor told her "it could possibly come back sometime." She saw a psychiatrist during her involvement with PCP at age 15. At age 14 she was taken twice to another psychiatrist who talked to her about her running away from home. In Orange County Juvenile Hall, she was counseled by a family psychologist to improve understanding between her and her family. When she first met appellant, in early 1978, she used some "crystal meth," or "speed," while traveling from Sacramento to Southern California and had the illusion that they were moving at a time when they were actually stopped.

At trial, appellant sought to elicit the same testimony of Klaess's "psychiatric history" as had been introduced at the preliminary hearing. The trial court refused to allow such cross-examination, ruling that it was not

relevant. Appellant claims the ruling was reversible error. He points out that "[c]ross-examination to test the credibility of a prosecuting witness in a criminal case should be given wide latitude." (*Curry* v. *Superior Court* (1970) 2 Cal.3d 707, 715 [87 Cal.Rptr. 361, 470 P.2d 345].) He relies in particular on *People* v. *Newton* (1966) 244 Cal.App.2d 82 [52 Cal.Rptr. 727], where one of two grounds for reversal was the cutting off of the defendant's cross-examination of the prosecuting witness concerning her consultations with a psychiatrist. The witness there had admitted one or two consultations two years before trial, and the cross-examination was intended to establish consultations for emotional problems at a later date.

Here, however, appellant sought only to elicit the testimony that Klaess had given at the preliminary hearing concerning her experience with drugs and psychiatric consultations. Her only experience, shown by that testimony, with long-range effects of drugs (as distinct from effects immediately after use) was in connection with her hospitalization for use of PCP at age 15. She had seen a psychiatrist at that time in connection with her PCP problems and had had psychiatric counseling at ages 14 and 15 concerning her relations with her family. That evidence did not have sufficient bearing upon the credibility of her testimony at the trial, when she was 20, to make its exclusion an abuse of discretion under Evidence Code section 352.

E. *Cross-examination About Specific Crimes Covered by Immunity Agreement*

■ Klaess testified on direct and cross-examination that under her plea bargain she was granted immunity from prosecution for all crimes allegedly committed in California up to December 22, 1978, in exchange for her truthful testimony and her plea of guilty to being an accessory after the fact of murder. She testified that the immunity covered not only the murders themselves but also the three robberies and two car thefts in which she had participated along with appellant, as described in her testimony.

Outside the presence of the jury, defense counsel stated he intended to ask Klaess whether she understood the immunity specifically applied to two additional robberies (naming the victims) in Sacramento in 1978 and asked that the district attorney instruct Klaess not to volunteer any details of those robberies beyond the scope of the questions asked. The district attorney stated that appellant had been involved with Klaess in both those robberies and that he would be willing to tell Klaess not to volunteer details. The court pointed out that because Klaess had testified that she and appellant lived together intermittently throughout 1978, the jury might infer that appellant was involved in those robberies even without testimony to that effect. The court ruled that the question about the two robberies

would be disallowed under Evidence Code section 352 as prejudicial to both sides. The ruling was thereafter broadened to cover any inquiry into additional specific crimes that would be covered by the immunity agreement.

 An accused is entitled to explore on cross-examination of a prosecuting witness the inducements from the prosecution that may have motivated testimony. (*Davis* v. *Alaska* (1974) 415 U.S. 308, 315-318 [39 L.Ed.2d 347, 353-355, 94 S.Ct. 1105]; *People* v. *Duran* (1976) 16 Cal.3d 282, 294 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1]; *People* v. *Winston* (1956) 46 Cal.2d 151, 157 [293 P.2d 40].) In attacking the present ruling, appellant relies principally on *People* v. *Allen* (1978) 77 Cal.App.3d 924 [144 Cal.Rptr. 6], where defendant was charged with committing a robbery in concert with a minor, who was the chief prosecution witness. Defendant in *Allen* was permitted to show that charges against the minor arising out of that robbery were still pending but was refused permission to cross-examine either the minor or his mother concerning pending charges against the minor of two other robberies. That refusal was held to be reversible error because "[t]he minor could have reasonably believed his punishment would have been greater for the three charges than for the one," and the defendant "had the right to show that both the minor and his mother were possibly under greater prosecution pressure because of three recent robbery charges than only one." (P. 933.)

Here the jury knew that in exchange for her testimony Klaess was escaping prosecution at least for two murders (other than as accessory after the fact), three robberies (two of which involved kidnappings), and two car thefts. Evidence that she was chargeable with, and being immunized for, two more robberies would not have added significantly to the already formidable attack on her credibility and would have risked imputing additional prior crimes to appellant. There is no indication from the extensive colloquy in the record that appellant was prepared to prove additional prior crimes for which Klaess was being immunized, apart from the two alleged Sacramento robberies.

Appellant argues that the potential prejudice to him was irrelevant in assessing the admissibility of evidence offered by his counsel, since it was counsel's prerogative to weigh tactical risks to the defense. But defense counsel also stated to the court that if appellant's connection with the two additional robberies were to come out inadvertently, as through a nonresponsive answer, he might move for a mistrial. The court could weigh that possibility in exercising its discretion under Evidence Code section 352.[2]

---

[2]Appellant urges that because his Sixth Amendment right of confrontation was violated when the trial court blocked inquiry into Klaess's understanding of the full scope of the

### F. *Postagreement Prosecution Assistance to Witness*

 Not only agreed immunity from prosecution but also other favors or assistance provided a witness by the prosecutor are generally relevant to a prosecuting witness's credibility. (*Duran, supra,* 16 Cal.3d at pp. 293-294.) Here the trial court stated it would permit cross-examination of Klaess concerning any assistance by the prosecution in her dealings with law enforcement authorities after the immunity agreement was entered into. When asked whether the prosecutor had intervened on her behalf in any problem she had with law enforcement authorities after her plea and release pursuant to the agreement, she answered, "No." Defense counsel then attempted to impeach her on the basis of a Los Angeles newspaper article reporting that Klaess had been taken into custody by police in Washington, D.C., and quoting her as saying that the prosecutor in the present case "told them that he did not want me booked." The court excluded any further cross-examination on the subject under Evidence Code section 352.

The ruling was unduly restrictive. But "[p]rejudice [from undue restriction of cross-examination] ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them." (*Alford* v. *United States* (1931) 282 U.S. 687, 692 [75 L.Ed. 624, 628, 51 S.Ct. 218]; see *Van Arsdall, supra.*) Klaess's testimony had already been placed in its proper "setting" by a thorough

immunity agreement, the standard of prejudice is that recently articulated by the United States Supreme Court in *Delaware* v. *Van Arsdall* (1986) 475 U.S. 673 [89 L.Ed.2d 674, 106 S.Ct. 1431]. There the majority held that a constitutionally improper restriction on cross-examination about bias must be deemed prejudicial if, "assuming that the damaging potential of the cross-examination were fully realized, a reviewing court [cannot] say that the error was harmless beyond a reasonable doubt. . . ." (475 U.S. at p. — [89 L.Ed.2d at p. 686].)

But *Van Arsdall* emphasized that a trial judge has broad latitude in restricting cross-examination which is repetitive or only marginally relevant. (*Id.,* at p. — [89 L.Ed.2d at p. 683].) There is no Sixth Amendment violation at all unless the prohibited cross-examination might reasonably have produced "a significantly different impression of [the witness's] credibility . . . .") (*Id.,* at p. — [89 L.Ed.2d at p. 684].) If cross-examination was improperly restricted, the prejudicial effect of the error on the trial as a whole depends on a multitude of factors, including the cumulative nature of the lost information, the extent of cross-examination otherwise permitted, the degree of evidence corroborating the witness, and the overall strength of the prosecution case. (*Id.,* at pp. —— [89 L.Ed.2d at pp. 686-687].)

Appellant suggests we cannot find that any constitutional error here was harmless beyond a reasonable doubt, because Klaess was such an important witness and the jury had such long and difficult deliberations. But we find no error under the *Van Arsdall* standard. As explained above, Klaess acknowledged she had been immunized for a multiple murder of police officers, three recent robberies, and two recent car thefts. Had it learned she also thought she had immunity for two earlier robberies, we cannot believe the jury would have formed "a significantly different impression of [her] credibility." For the same reason, we conclude that if any constitutional error occurred, it was harmless beyond a reasonable doubt.

examination of her motives for cooperating with the prosecution. For the purpose of enabling the jury to assess Klaess's credibility, evidence of the Washington, D.C., incident could have added little to this "environmental background." (See *People* v. *Mardian* (1975) 47 Cal.App.3d 16, 40-41 [121 Cal.Rptr. 269].)

G. *Sanchez Statement to Social Worker re .22 Caliber Handgun Found at Scene*

■ Appellant called Sylvia Fernandez Boyle, an unlicensed clinical social worker. While employed at the University of California at Davis Community Health Center, Boyle had counseled Robert Sanchez concerning marital problems in late 1978 or early 1979. Defense counsel offered to prove, through Boyle, that during a counseling session Sanchez stated that the gun found at the scene of the highway patrol killings came from him and that he was fearful of being considered a suspect in the case. The court excluded the statement as privileged (Evid. Code, § 1014) and as remote and prejudicial (*id.*, § 352). We conclude that even if Sanchez's statement to Boyle was technically admissible, any error in excluding it was harmless.

Sanchez had testified earlier that he had never before seen the .22 caliber handgun found at the crime scene (exhibit 6), and he had denied ever giving, selling, loaning, or transferring any handgun to appellant or Klaess before the highway patrol killings. On direct examination, Klaess testified that the gun used by appellant in the first robbery in which she acknowledged participating with him had been purchased by appellant from a stranger who offered it for sale outside Torey's restaurant, next door to the Bel Air Motel in West Sacramento. She also testified, however, that while she and appellant were staying with Sanchez and Mrs. Sanchez during the week or two before Klaess and appellant moved into the Bel Air Motel, appellant acquired a gun similar to exhibit 6 from Sanchez. She admitted that during a pretrial interview she had stated that exhibit 6 came from Sanchez, but her trial testimony vacillated between statements that appellant had acquired exhibit 6 from the man at Torey's and statements that she did not know whether appellant had acquired it from that man or from Sanchez.

In light of Klaess's testimony, the likely effect of admitting Sanchez's statement to Boyle would have been only to indicate to the jury that appellant had acquired the gun from Sanchez, then left it at the scene of the crime. The offer of proof was that Sanchez said the gun "came from" him, not that he said it was his.

Appellant argues that the offered statement would have impeached Sanchez's denial of any connection with the gun and permitted the jury to

infer a consciousness of guilt on his part. Here, however, the far more likely inference from Sanchez's statement to Boyle would be not that he was conscious of any guilty connection with the crime but only that he was fearful of becoming a suspect because the gun that appellant left at the crime scene had been acquired by him from Sanchez. We see no reasonable possibility that admission of Sanchez's statement would have focused the jury's suspicion toward him.[3]

Nor was appellant injured by loss of an opportunity to impeach Klaess's credibility. Her testimony regarding the origin of exhibit 6 was confusing and contradictory on its face. Nevertheless, she specifically acknowledged (1) that appellant had acquired a handgun "similar" to exhibit 6 from Sanchez, (2) that exhibit 6 itself might have come from Sanchez, and (3) that she had definitely linked Sanchez to exhibit 6 in a pretrial interview. The jury thus had ample opportunity to assess Klaess's believability on this issue and to draw its own inferences about the origin and identity of exhibit 6. Sanchez's own statement would have given little further assistance. We find no reversible prejudice in the trial court's ruling.

H. *Exclusion of Tape Recording Offered to Impeach Klaess on Source of Appellant's Gun*

■ As already noted, Klaess testified that during the month or so before the crime, appellant acquired a .22 handgun from a stranger at Torey's restaurant and also acquired such a gun from Sanchez. She stated at some points in her testimony that the gun at the crime scene (exhibit 6) was the one acquired at Torey's and at other points that she did not know whether the man at Torey's or Sanchez was appellant's source of exhibit 6. She was confronted during her testimony with the transcript of her pretrial interview with the prosecutor, and in particular with a statement in that transcript that the source of exhibit 6 was Sanchez.

Defense counsel offered the original tape recording of that interview to show Klaess's "demeanor" in making the statements concerning the gun.

---

[3]After Boyle left the stand, the defense presented other evidence that is claimed to cast suspicion on Sanchez. Appellant testified that upon his and Klaess's arrival in West Sacramento from Crockett in the early morning hours of December 22, Klaess drove off alone in the Camaro looking for cocaine. Also, among the widely varying observations of the crime scene testified to by passing motorists were statements that a white car (described by one witness as a white Ford Galaxy) was parked near the highway patrol car. Those statements are claimed to link Sanchez to the crime because of earlier testimony (prior to Boyle's testifying), including the admission of Sanchez, that he then had a white Ford Galaxy, acquired from appellant in exchange for a van. But even when added to this other evidence, Sanchez's statement to Boyle was highly unlikely to induce the jury to infer a possibility that Sanchez was connected to the murders while appellant was not.

Counsel asserted that the recording would demonstrate that her voice was forthright and spontaneous in stating that the gun was acquired from Sanchez but slow, equivocal, and evasive in stating that it came from the man at Torey's. The trial court ruled that the sound of Klaess's voice on the tape, "her pauses, her hems and haws," were irrelevant to her state of mind and so ruled the tape inadmissible.

Appellant invokes the best evidence rule (Evid. Code, § 1500), but that objection is unavailable since there is no claim that the transcript is inaccurate. (*People* v. *Fujita* (1974) 43 Cal.App.3d 454, 473 [117 Cal.Rptr. 757].) Without assessing the theoretical soundness of the stated reason for the court's ruling, we are satisfied that exclusion of the tape was not prejudicial. The transcript itself reflected much of Klaess's hesitancy and indecision in speaking on the source of the gun, and defense counsel challenged her at length with her inconsistent statements in the transcript. The jury was thus able to observe her demeanor in dealing with the subject on the stand.

Finally, as noted in connection with the exclusion of the Sanchez statement to the clinical social worker, Boyle, it was relatively unimportant to the issues before the jury whether appellant had obtained the gun from Sanchez or from the man at Torey's. Klaess's testimony was clear that regardless of the source of the gun, it was appellant himself who had last had it in his possession before the crime.

I. *Exclusion of Evidence of Klaess's Drug Connections*

■ On redirect examination, appellant was asked whether Klaess knew, or said she knew, persons in the Sacramento area from whom she could obtain drugs. The prosecutor's objections to both questions were sustained. The bench conference on the ruling is not reported, but according to a stipulation and order for settlement of the record, the stated ground for exclusion was that "such questioning would elicit evidence of criminal activity on the part of Klaess already held inadmissible by prior rulings of the court."

At the time of those prior rulings, however, appellant had not yet presented his theory that Klaess had committed, or been involved in, the charged crimes without his participation. He testified that he and Klaess drove from Crockett to West Sacramento between 1:30 and 2:30 a.m. on December 22 without encountering the highway patrol, and that when he parked the Camaro at the end of that trip, Klaess said she wanted more cocaine and drove off alone in the Camaro. He also testified that his temporary driver's license, later found at the crime scene, was then in Klaess's

purse, and that when he saw her on awaking at the motel at 7:30 a.m., she refused to say where she had been and demanded that appellant say they had been together all night.

In light of appellant's testimony, evidence that Klaess had drug connections in Sacramento would have been relevant to corroborate his statement that she had left for the purpose of obtaining more cocaine by showing that she had the means and opportunity to do so. There was no danger of undue prejudice since Klaess had already admitted to drug abuse and to commission of robberies and other crimes.

We conclude, however, that the court's erroneous exclusion of that evidence is not ground for reversal. Klaess testified to living with several people in Sacramento at various times in October and November of 1978, while she was separated from appellant. She was an admitted cocaine user and it was uncontradicted that she had used cocaine the evening before the crimes in Crockett as well as on the next day in Sacramento.

There was a conflict of testimony as to whether appellant and Klaess possessed cocaine when they returned to West Sacramento: appellant testified that all the cocaine he purchased in Crockett was used up there, while Klaess and Engel said he took some of it with him when he left. A finding that appellant still had some cocaine when he and Klaess arrived in West Sacramento would tend to discredit his claim that Klaess left him to forage for more cocaine. But in light of the evidence of Klaess's background, it appears most unlikely that the jury would have rejected that claim simply on the theory that she did not know where or how to obtain the cocaine in Sacramento. Accordingly, we find no reasonable probability that admission of the evidence would have led to a result more favorable to appellant and conclude that exclusion of the evidence is not ground for reversal. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

J. *Exclusion of Reasons for Klaess's Hatred of Police*

 Klaess admitted that she hated police. The trial court twice ruled that her reasons for such hatred were irrelevant, despite defense counsel's claim that evidence of those reasons would tend to show a motive for her participation in the charged murders and impeach her testimony that she sat passively in the Camaro after she and appellant were stopped by the highway patrol officers. Appellant challenges those rulings as error.

Despite the rulings, Klaess testified without objection on cross-examination that she hated police because she "had been arrested a lot of times[,] . . . had a chip on [her] shoulder from getting into trouble[, and]

. . . just didn't like getting thrown in jail." She said her experience with the Richmond police in November 1978 when she "got maced" intensified her hatred of police. When asked if she wanted to hurt police officers if the opportunity should arise, she replied, "No, I just wanted to be left alone by them." Later appellant testified to hearing Klaess repeatedly express her feelings against police, though he said he never heard her threaten to kill them.

The only subjects on which defense counsel was precluded from cross-examining Klaess as a result of the rulings were (1) the details of Klaess's experience with the Richmond police in the incident alluded to and (2) an arrest in Sacramento. Both incidents involved appellant as well as Klaess. Appellant later testified without objection that on both occasions she was loud and insulting toward the police and that in the Richmond incident she complained, "It's hurting, it's hurting," when the police pulled her handcuffs upward behind her back.

Not only the admissions of her hatred of police but also the evidence of her crime spree with appellant during the 48 hours preceding the highway patrol killings amply established her reasons for animosity toward police. The trial court could properly conclude that the confusion of issues that would result from introducing the excluded evidence of her confrontations with police would outweigh the evidence's probative value. (Evid. Code, § 352.)

K. *Evidence of Appellant's Statements of Hatred of Police and Threats to Kill Police*

■■■■ Over objection the trial court admitted testimony of several prosecution witnesses that at various times in 1978 they had heard appellant express contempt and hatred for police and declare that he would kill any officer who attempted to arrest him. The witnesses included persons whom appellant and Klaess had known as friends and neighbors, or as apartment mates, in Southern California, appellant's jail cellmate in Sacramento in November 1978, and the woman companion who stated she had not only heard appellant's threats but physically stopped him from reaching for a shotgun when an officer stopped their car while appellant was driving. Appellant now contends it was reversible error to admit this testimony, relying on Evidence Code sections 1101 and 352.

In relying on Evidence Code section 1101, appellant assumes that the statements in question constituted "conduct" and that they were introduced to prove his "disposition" to commit the crimes rather than to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or ab-

sence of mistake or accident'' (Evid. Code, § 1101, subd. (b)).[4] A defendant's threat against the victim, however, is relevant to prove intent in a prosecution for murder. (*People* v. *Lew* (1968) 68 Cal.2d 774, 778 [69 Cal.Rptr. 102, 441 P.2d 942].) The statements here in question did not specify a victim or victims but were aimed at any police officer who would attempt to arrest appellant. Such a generic threat is admissible to show the defendant's homicidal intent where other evidence brings the actual victim within the scope of the threat. (*People* v. *Merkouris* (1956) 46 Cal.2d 540, 557 [297 P.2d 999]; *People* v. *Wilt* (1916) 173 Cal. 477, 481-483 [160 P. 561]; *People* v. *Craig* (1896) 111 Cal. 460, 466 [44 P. 186]; *People* v. *Manson* (1976) 61 Cal.App.3d 102, 140-141 [132 Cal.Rptr. 265]; 1A Wigmore, Evidence (Tillers ed. 1983) § 106; 1 Wharton, Criminal Evidence (13th ed. 1972) § 203.) Hence the statements were relevant and not excludable under Evidence Code section 1101.

Appellant contends that the threats should have been excluded under Evidence Code section 352 as cumulative to the evidence of the robberies, kidnappings, and other crimes committed by appellant, together with Klaess, on December 20 and 21. Those crimes, however, tended to prove a different aspect of appellant's state of mind. Whereas the threat, repeated over a period of several months preceding the charged murders, tended to show a design or intent to kill members of a class of persons under certain circumstances, the crimes, committed less than 48 hours before the murders, tended to show a motive for killing the officers, i.e., a natural desire to escape the severe punishment that could be anticipated if defendant were arrested. The prior crimes were admissible for the latter purpose. (*People* v. *Durham* (1969) 70 Cal.2d 171, 186-189 [74 Cal.Rptr. 262, 449 P.2d 198]; see *People* v. *Thompson* (1980) 27 Cal.3d 303, 319, fn. 23 [165 Cal.Rptr. 289, 611 P.2d 883].)

Appellant contends that because his defense was his absence from the time and place of the crimes, he did not challenge the proof of homicidal intent and premeditation, based on the evidence found at the scene, e.g., that Officer Freeman was shot five times and Officer Blecher was shot while handcuffed. Appellant argues that consequently, ''[t]he only real issue during the guilt phase was identity,'' and therefore the evidence of

---

[4]Evidence Code section 1101 provides: ''(a) Except as provided in this section and in Sections 1102 and 1103, evidence of a person's character or a trait of his character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his conduct) is inadmissible when offered to prove his conduct on a specified occasion. (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than his disposition to commit such acts. (c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness.''

his prior conduct offered to prove homicidal intent and premeditation should have been excluded.

There are two answers to that contention. First, appellant's alibi defense was not revealed until after the close of the prosecution's case. The amended information charged the willful murder, with malice aforethought and with premeditation and deliberation, of each of the victims. The prosecution had the burden of proving those elements before the close of its case in chief. (§ 1118.1.)

Second, the prosecution was not required to assume that the jury would find premeditation and deliberation simply on the basis of the circumstances of the killings inferable from the testimony of Klaess and the evidence found at the scene. ■■ Evidence of premeditation and deliberation typically shows not only the manner of killing, but also "planning" activity and "motive." (*People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942].) ■■ The evidence of appellant's prior threats and crimes furnished proof of planning and motive that did not duplicate the evidence of what happened at the scene.

### L. *Accomplice Status as Question of Fact; Sufficiency of Instructions*

■■ The jury was instructed to determine whether or not Klaess, the principal prosecution witness, was an accomplice (CALJIC No. 3.19) and told that if they made such a finding, her testimony should be viewed with distrust (CALJIC No. 3.18) and would have to be corroborated by evidence tending to connect appellant with commission of the offense charged (CALJIC No. 3.12). The instructions correctly stated the consequences of accomplice status. (§ 1111; *People* v. *Gordon* (1973) 10 Cal.3d 460, 466, fn. 3 [110 Cal.Rptr. 906, 516 P.2d 298].) The trial court denied, however, appellant's request to remove determination of that status from the jury by instructing that Klaess was an accomplice as a matter of law (CALJIC No. 3.16). Appellant now claims that denial as reversible error.

An accomplice is defined as "one who is liable to prosecution for the identical offense charged against the defendant on trial" (§ 1111), and the jury was so instructed (CALJIC No. 3.10). The parties differ, however on the effect of that definition on establishing accomplice status as a matter of law. The Attorney General's position appears to be that Klaess should have been deemed an accomplice as a matter of law only if the evidence of her participation in the murders was "so exclusively onesided and undisputed" that if she were charged with the murders along with defendant, a jury could not reasonably acquit her. Appellant, on the other hand, contends that because an accomplice need only be "liable to prosecution"

(§ 1111), Klaess was an accomplice as a matter of law if the record discloses "probable cause" for her prosecution, i.e., evidence that if believed would support her conviction as principal.

■ It is well settled that the phrase "liable to prosecution" in section 1111 means, in effect, *properly* liable. Any issues of fact determinative of the witness's factual guilt of the offense must be submitted to the jury. Only when such facts are clear and undisputed may the court determine that the witness is or is not an accomplice as a matter of law. (*People* v. *Easley* (1983) 34 Cal.3d 858, 874 [196 Cal.Rptr. 309, 671 P.2d 813]; *People* v. *Tewksbury* (1976) 15 Cal.3d 953, 960 [127 Cal.Rptr. 135, 544 P.2d 1335]; *People* v. *Hoover* (1974) 12 Cal.3d 875, 880 [117 Cal.Rptr. 672, 528 P.2d 760].) The decisions stating that "[o]ne is 'liable to prosecution' for an offense if it has been committed and there is 'probable cause' to believe he has committed it" (*People* v. *Dailey* (1960) 179 Cal.App.2d 482, 485 [3 Cal.Rptr. 852], citing *People* v. *Cowan* (1940) 38 Cal.App.2d 231, 242 [101 P.2d 125]) are not inconsistent with these principles. In *Dailey* accomplice status was established by uncontradicted facts (179 Cal.App.2d at pp. 485-486), while in *Cowan* the uncontradicted evidence showed that the witness was not an accomplice (38 Cal.App.2d at pp. 240, 240-242). The accomplice rule is intended to alleviate distortion stemming from consciousness of guilt, not from fear of unjust prosecution. Self-exculpatory testimony is certainly false if the witness is in fact guilty, but much less likely untruthful if the witness is innocent though falsely accused. And testimony by one not actually guilty is less prone to be "'tainted . . . [or] given in the hope or expectation of leniency or immunity.' [Citations.]" (*Tewksbury, supra,* 15 Cal.3d at p. 967; see *People* v. *Howell* (1924) 69 Cal.App. 239 [230 P. 991].)

Appellant contends that Klaess's accomplice status was established as a matter of law by her testimony that appellant had expressed an intention to kill police officers if necessary to avoid arrest and imprisonment; that she thereafter willingly participated with appellant in armed robberies, kidnappings, and auto thefts during the two days preceding the killing of Officers Freeman and Blecher; that she hated police and was more concerned for herself and appellant than for the wounded officer she observed from the Camaro window; and that she assisted appellant in escaping from the crime scene and disposing of evidence. Appellant claims that these facts are indistinguishable from those held sufficient to sustain a first degree murder conviction in *People* v. *Durham, supra,* 70 Cal.2d 171.

In *Durham,* Los Angeles police officers stopped a stolen Thunderbird at 4 a.m. Durham was driving the Thunderbird and Robinson was the passenger. Durham got out and talked with the officers. Robinson was ordered

out and, on emerging, pulled a handgun. In the ensuing exchange of gunfire, one officer was fatally wounded and Robinson was hit. The other officer then turned his attention to Durham and ordered him not to move. Durham obeyed, except that at one point he started to lower his hands, was told to keep them raised, and did so. At the time, Durham and Robinson were both felony parole violators from Ohio; they had committed armed robberies in Ohio and Nebraska within the preceding 11 days; and Robinson had fired his gun during the escape from the second robbery. The Thunderbird had been stolen in San Francisco.

This court concluded that from the foregoing evidence the jury could reasonably infer that Durham and Robinson had been engaged in a joint expedition to commit robberies and forcibly resist arrest, and that at the time of the traffic stop in Los Angeles, Durham knew he was driving a stolen vehicle, and knew that Robinson had used his gun in the prior robberies and was then armed. It was held that with these inferences the evidence was sufficient to sustain Durham's conviction for first degree murder as an aider and abettor under the following principles quoted from *People v. Villa* (1957) 156 Cal.App.2d 128, 133-134 [318 P.2d 828]: " ' "To be an abettor the accused must have *instigated or advised* the commission of the crime *or been present for the purpose of assisting in its commission.* He must share the criminal intent with which the crime was committed. . . . [W]hile mere presence alone at the scene of the crime is not sufficient to make the accused a participant, and while he is not necessarily guilty if he does not attempt to prevent the crime through fear, such factors may be circumstances that can be considered by the jury with the other evidence in passing on his guilt or innocence. *One may aid or abet in the commission of a crime without having previously entered into a conspiracy to commit it.* [Citations.] *Moreover, the aider and abettor in a proper case is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged. Whether the act committed was the natural and probable consequence of the act encouraged and the extent of defendant's knowledge are questions of fact for the jury.* [Citations.]' (Italics added.)" (*Durham, supra,* 70 Cal.2d at p. 181; but cf., *People v. Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318].)

 It does not follow from *Durham* that Klaess was an accomplice as a matter of law. Though appellant had declared he would kill police if necessary to escape arrest, Klaess testified she did not take those statements seriously. She admittedly hated police herself, but appellant testified he had never heard her threaten to kill them. Thus the jury was not required to infer that she shared with appellant an intent to resist arrest at the risk

of killing the arresting officers. Nor did her mere presence and inaction at the crime scene (*People* v. *Strickland* (1974) 11 Cal.3d 946, 958 [114 Cal.Rptr. 632, 523 P.2d 672]; *Pinell* v. *Superior Court* (1965) 232 Cal.App.2d 284, 287 [42 Cal.Rptr. 676]) or assistance in defendant's escape (*Hoover, supra,* 12 Cal.3d at p. 879) establish conclusively that she was liable as a principal and was thus an accomplice.

Appellant complains, however, that there were gaps in the jury instructions on accomplice status that prevented the jury from making a proper finding that Klaess was an accomplice. Specifically, appellant contends that the trial court on its own motion should have instructed on "the principles of vicarious liability" as stated in the final (optional) paragraph of CALJIC No. 3.00: "One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged." Appellant also cites CALJIC No. 6.11, which states that a conspirator is responsible for an act of a fellow conspirator that is a natural and probable consequence of the object of the conspiracy.

The only purpose advanced by appellant for giving such an instruction would be to provide a legal basis for a conclusion by the jury that Klaess was an accomplice under a *Durham* theory, i.e., that a natural and reasonable, or probable, consequence of her riding with appellant from Crockett to West Sacramento in the stolen Camaro was that appellant would resist with deadly force if stopped by law enforcement officers. That theory could apply only if the jury found that appellant was present at the time and place of the crime and personally fired a gun at the officers. Those findings, however, would undercut the benefits to appellant from labeling Klaess an accomplice. Thus, the findings would render pointless any corroboration tending to connect appellant with commission of the crimes (§ 1111) and would eliminate any doubt of the truth of Klaess's testimony that appellant personally shot at the officers.

Moreover, the proposed instruction would be superfluous if the jury concluded that Klaess had personally participated in the shooting since she would then be an aider and abettor under CALJIC No. 3.10, through which the jury was told that "[t]o be an accomplice, the person must have aided, promoted, encouraged, or instigated by act or advice the commission of such offense with knowledge of the unlawful purpose of the person who committed the offense."[5] Thus, the only way the jury could have (1) found

---

[5]The 1984 revision of CALJIC No. 3.10, published after the trial court gave the version quoted in the text, narrowed the definition of accomplice in accordance with the drafters' interpretation of *Beeman, supra.* Since defendant urges only a broadening of the definition, he has no occasion to claim error on the basis of that revision.

accomplice status under the proposed instruction on responsibility for natural and probable consequences of any act knowingly aided or encouraged and (2) not found accomplice status under the instructions that actually were given, would have been to conclude that appellant personally shot and killed the officers as charged. Accordingly, the absence of the proposed instruction could not have substantially prejudiced him.

M. *Refusal of Instructions on Manslaughter Based on Diminished Capacity*

Defense counsel asked the court to instruct the jury on voluntary and involuntary manslaughter as lesser included offenses based on diminished capacity, as a result of intoxication, to form the mental states requisite to murder. The request was correctly rejected as lacking support in the evidence.

Appellant testified that in the early evening of December 21, he and Klaess purchased a half pint of brandy in Sausalito just before their kidnap-robbery of the woman victim. (That robbery was reported to the police at 9:25 p.m.) He further testified as follows: He and Klaess consumed all the brandy, sharing it equally. In Richmond, they bought a pint of 151 proof rum and some Coca Cola, from which appellant had one mixed drink at the home of their friend in San Pablo and one more mixed drink at Engel's home in Crockett. He also had about three "lines" of cocaine in Crockett. On leaving Crockett he was "under the influence" of the alcohol and cocaine and "feeling all right" but not "drunk or overly drunk or high on cocaine."

Klaess's testimony was not materially different. She said that of the brandy, she "might have had one or two drinks" and that appellant "had most of it." She said that in addition to the pint of rum, they bought a half pint, all of which she drank. She testified, similarly to appellant, that they each had one drink in San Pablo. She said that in Crockett, she, appellant, Engel, and Engel's boyfriend drank from the pint bottle of rum, and a quarter of the bottle remained unconsumed when she and appellant departed. As for cocaine, Klaess testified that appellant had "a lot," eight lines. She said he was "under the influence" when they left Crockett, in that he was "talkative and really hyper."

This testimony lent only minimal and insubstantial support to appellant's theory of diminished capacity from intoxication and therefore was not sufficient to justify the requested instruction. (*People* v. *Flannel* (1979) 25 Cal.3d 668, 684-685 [160 Cal.Rptr. 84, 603 P.2d 1].) As in *Flannel*, appellant had consumed relatively small amounts of alcohol over a period

of several hours before commission of the crimes. Although there was testimony that he was "under the influence" of alcohol and cocaine, there was no evidence that his faculties were affected sufficiently to interfere with his capacity to form the mental states requisite to murder. As to the effects of the cocaine, Klaess testified that from her experience cocaine is an "upper" and alcohol a "downer" and that they offset each other to some degree. There was no evidence that appellant had incoherent speech, or was driving erratically, during the early morning hours of December 22, and he claimed no unusual difficulty in recalling events during those hours. The request for the instructions was properly denied. (*People* v. *Harris* (1981) 28 Cal.3d 935, 958-959 [171 Cal.Rptr. 679, 623 P.2d 240].)

### N. *Claimed Errors Arising Out of Jury's Guilt Phase Deliberations*

#### 1. *Factual Background*

Appellant makes three claims of error pertaining to the jury's deliberations at the guilt phase: (1) that the trial court commented on the evidence after deliberations had commenced; (2) that the comments contained errors prejudicial to appellant; and (3) that appellant's motions for mistrial were denied despite indications that the jury was deadlocked. The following facts relate to all three claims.

On January 23, 1981, the 56th day of trial, the jury commenced deliberations. It had heard about 40 days of testimony from 124 witnesses, and about 250 exhibits had been placed in evidence.

During the first six days of deliberations, the jury requested and heard the reading of all or parts of the testimony of ten witnesses. Some of that testimony pertained to the timing of appellant's arrival at Engel's home in Crockett, of his visit to the bar in Crockett, and of his departure, with Klaess, for West Sacramento in the early morning hours of December 22. One of the items read was the entire testimony of Wanda Hawthorne, who, it will be recalled, had testified to seeing a brown Camaro with driver and one passenger, beginning about 2 a.m., driving eastbound on Interstate 80 between Vacaville and Davis.

On the sixth day, February 2, a juror was excused for illness and replaced by an alternate. The jury was instructed to begin deliberations anew. The alternate had, however, heard the foregoing reading of testimony.

Next day, February 3, the jury requested, and heard, additional testimony on the timing of appellant's visits to Engel's home and the bar in

Crockett, and on February 4, it heard testimony concerning appellant's activities in Sacramento the day after the highway patrol killings.

After deliberating all day on February 5, the jurors sent a note to the judge stating that they "cannot reach a unanimous verdict." They were told to adjourn for the day and resume deliberations in the morning. The next day, they asked for and heard a repeat reading of the testimony of Wanda Hawthorne. Later that afternoon, the jury sent two notes to the judge, stating that its members "cannot agree unanimously" and that the "impasse" had "been verbally expressed as final." The court denied a defense motion for mistrial and told the jury to return Monday morning, February 9, when he would give further instructions.

On February 9, the jury initially asked for time for a final effort to resolve the impasse, but an hour later said it was ready for instructions. Court and counsel then discussed the prosecutor's proposal for a supplemental charge commenting on the evidence, which the defense opposed. Meanwhile, that afternoon, the court ascertained that the jury was still deadlocked but denied a further motion for mistrial. Next morning, February 10, the court orally delivered to the jury the supplemental charge to which defendant now objects, principally with respect to its comments on the Hawthorne testimony. Next day, February 11, the jury requested and, over defense objection, was given a written copy of that first supplemental charge. In the afternoon the jury again sent a note that it could not arrive at a decision, and a defense motion for mistrial was again denied.

On the next court day, February 13, the court gave, over defense objection, a second supplemental charge, repeating previous instructions on such matters as burden of proof, credibility of witnesses, and the duty of each juror to decide independently. Later that day, the jury sent a note stating: "Instructions regarding our requests for reading of testimony relative to time helped our deliberations considerably. The jury would now like to hear your instructions regarding the use of testimony of passersby who passed the crime scene in the early morning hours of 12-22-78. Also, please give us instructions related to jurors using the 'feelings' and 'beliefs' to justify the credibility of Rodriguez and Klaess's testimony. Please provide a written copy of instructions relative to the aforementioned." In response, on the next court day, February 17, the court gave a third supplemental charge providing general guidance on jurors' duties in assessing conflicting testimony.

Next day, February 18, the jury sent another note that it was "hopelessly deadlocked." The court denied another motion for mistrial and, over defense objection, sent the jury a questionnaire asking the number of ballots

taken since February 2, the numerical division on each ballot, and the date of the last ballot. The jury replied that it had taken five ballots between February 2 and February 11, and had been divided 11 to 1 on each ballot. The content of the votes was not revealed. The defense again moved for a mistrial, contending that an order to resume deliberations would imply a direction to the minority juror to acquiesce in the majority's views. The motion was denied.

During deliberations on the next day, February 19, the jury sent another note requesting the testimony of defendant and another witness concerning a jacket which the prosecution contended, and defendant denied, that he had worn during the early morning of December 22. The requested testimony was read on the next day of deliberations, February 23. There were requests for the reading of additional testimony on February 23 and 24; these were complied with. On February 25, the jury returned its guilt phase verdicts.

*2. Claim of Error in Commenting on Evidence After Jury Announced It Was Deadlocked.*

 Appellant's initial contention is that the first supplemental charge was error simply because it was delivered after the jury announced it was deadlocked. He relies on a recent decision of this court, *People* v. *Cook* (1983) 33 Cal.3d 400 [189 Cal.Rptr. 159, 658 P.2d 86].

In *Cook,* the trial judge expressed his belief in the defendant's guilt to a jury which claimed it had arrived at an impasse. The majority, in an opinion authored by the Chief Justice, held that judicial comment on the ultimate issue of guilt or innocence is always improper. (Pp. 412-413.) But the "primary issue" addressed by the majority was the timing of the trial court's remarks. "[Judicial] [c]omment [on the evidence] at a time when the jury is deadlocked," said the majority, "is so likely to invade the jury's province and control its verdict that such comment must be deemed erroneous." (P. 413.)

Justices Mosk, Broussard, and Spencer[6] joined the Chief Justice's opinion. Justices Richardson, Kaus, and Reynoso concurred in the *Cook* result, accepting the premise that judicial comment on guilt or innocence should be avoided. However, these justices dissented from the majority's proposition that a trial judge may offer *no* comment on the evidence, however mild and "scrupulously fair" his remarks, once the jury has announced an impasse in deliberations. After careful reflection, we, like the *Cook* dis-

---

[6]Presiding Justice Spencer of the Second District Court of Appeal was sitting under temporary assignment here.

senters, are convinced that *Cook*'s absolute prohibition of postdeadlock comment was ill-advised. We will therefore overrule that portion of *Cook.* We explain our reasons in detail.

The trial judge's privilege not only to summarize the evidence, but to analyze it critically, is rooted in English common law. (See, e.g., *Patton* v. *United States* (1930) 281 U.S. 276, 288-289 [74 L.Ed. 854, 858-859, 50 S.Ct. 253]; Comment, *Power to Comment on the Issue of Guilt: Trial by Jury or Trial by Judge* (1964) 9 Vill. L.Rev. 440.) The power of comment "has been a constant source of disagreement among American legal authorities." (*Power to Comment etc., supra.*) Indeed, for many years our state's Constitution expressly forbade trial judges to analyze the facts for the jury. Article VI, former section 19, provided that "[j]udges *shall not* charge juries with respect to matters of fact, but may state the testimony and declare the law." (Italics added.)

In 1934, however, the Constitution was amended to restore the power of comment in broad terms. Under current article VI, section 10, "[t]he court *may* make such *comment* on the evidence . . . *as in its opinion is necessary for the proper determination of the cause.*" (Italics added.)

The purpose of the 1934 amendment "was to abolish the prior limitations on the trial judge's participation in the trial of a case with respect to comment on the evidence and the credibility of witnesses." It sought to place "more power" in the judge's hands "and [to] make him a real factor in the administration of justice . . ., [not] a mere referee or automaton as to the ascertainment of the facts. . . ." (*People* v. *Ottey* (1936) 5 Cal.2d 714, 723 [56 P.2d 193]; see also *People* v. *Brock* (1967) 66 Cal.2d 645, 650 [58 Cal.Rptr. 321, 426 P.2d 889].)

On its face, the constitutional language imposes no limitations on the content or timing of judicial commentary, deferring entirely to the trial judge's sound discretion. The appellate courts have recognized, however, that this powerful judicial tool may sometimes invade the accused's countervailing right to independent jury determination of the facts bearing on his guilt or innocence. Hence, the decisions admonish that judicial comment on the evidence must be accurate, temperate, nonargumentative, and scrupulously fair. ■ The trial court may not, in the guise of privileged comment, withdraw material evidence from the jury's consideration, distort the record, expressly or impliedly direct a verdict, or otherwise usurp the jury's ultimate factfinding power. (E.g., *Brock, supra,* 66 Cal.2d at pp. 650-651; *People* v. *Friend* (1958) 50 Cal.2d 570, 577-578 [327 P.2d 97]; *People* v. *DeMoss* (1935) 4 Cal.2d 469, 477 [50 P.2d 1031].)

Pre-*Cook* California decisions had evaluated the propriety of judicial comment on a case-by-case basis, balancing defendants' jury-trial rights against the broad right of comment expressly conferred by the Constitution. No case had suggested that, notwithstanding article VI, section 10, fair comment to a deadlocked jury was prohibited.[7]

Nonetheless, *Cook* reasoned that comments delivered after deliberations had begun are more likely to coerce a verdict than those given at the conclusion of the evidence (citing *Cooper* v. *Superior Court* (1961) 55 Cal.2d 291, 299-300 [10 Cal.Rptr. 842, 359 P.2d 274]),[8] and that comments made to a jury which has announced its inability to reach a verdict "are even more apt to be controlling. Abiding by the trial court's opinion will provide the deadlocked jury with an easy alternative to the arduous task of attempting to hammer out a unanimous decision. It is too much to expect that jurors who have honest opinions different from that of the more experienced trial judge will be able to hold to their positions after the trial court explains its views to them. [Fn. omitted.]" (33 Cal.3d at p. 410.)

*Cook* further declared that a rule prohibiting postdeadlock comment would promote policies like those underlying *People* v. *Gainer* (1977) 19 Cal.3d 835 [139 Cal.Rptr. 861, 566 P.2d 997], which had disapproved the so-called "*Allen* charge." The *Allen* charge encouraged minority jurors to consider the majority's views and thus tended to coerce a subjugation of minority to majority opinion. "The coercive nature of . . . comments on the evidence to a deadlocked jury," *Cook* declared, "is only slightly different. The comments tend to compel the jurors to harmonize their views with those of the judge, rather than with those of the majority. [In each case,] [t]he accused is highly likely to be deprived of the right to have his guilt or innocence determined by the independent vote of each juror." (33 Cal.3d at p. 411.)

The principal mistake in this analysis, we conclude, is that it confuses a constitutionally endorsed form of assistance to jurors with prohibited

---

[7]The two California opinions on which the *Cook* majority most strongly relied for this rule, *People* v. *Moore* (1974) 40 Cal.App.3d 56 [114 Cal.Rptr. 655], and *People* v. *Flores* (1971) 17 Cal.App.3d 579 [95 Cal.Rptr. 138], provide little support for it. *Moore* and *Flores* are discussed in greater detail below.

[8]*Cooper* overturned a contempt judgment against a lawyer who disobeyed a trial court's order to remain silent. After the jurors had deliberated three weeks in a murder case, the judge, acting without warning, stationed bailiffs behind defense counsel, recalled the jury, and began to express his views on the credibility of crucial witnesses. Defense Attorney Cooper rose to object but was told to wait until the jury had again retired. When Cooper persisted, he was held in contempt. This court found that the silence order was unlawful, since counsel had no prior opportunity to object, and no later admonishment to the jury would cure the prejudicial effect of any error in this "unusual procedure." In dictum, *Cooper* remarked that counsel had strong reason to protest in his client's behalf, since the judicial comments were made after deliberations began, and "[their] coercive effect . . . would [thus] be particularly great . . . ."

coercion. In effect, the *Cook* majority declared that the more *effective* the judge's fair comments are likely to be, the more impermissibly coercive they must be found.

Yet, under our Constitution, the right to independent jury determination of facts does not mean that a jury must be free of all judicial influence during its deliberations. The very purpose of the privilege of fair comment by the most influential person in the courtroom is to give jurors the benefit of his experience in evaluating evidence. If there were an absolute prohibition against *useful* judicial comment, the privilege would be meaningless. And if this court thought that effective judicial comment violates the right to jury trial, we were obliged to say so sometime in the half century since the 1934 constitutional amendment.

Of course, a judicial power expressly set forth in our state Constitution cannot violate jury-trial rights guaranteed by the same charter. And it is established beyond doubt that the *federal* jury-trial right, which includes all essential features of the right "understood and applied at common law," contemplates "the superintendence of a judge having power to instruct [the jurors] as to the law *and advise them in respect of the facts. . . ."* (*Patton, supra,* 281 U.S. at p. 288 [74 L.Ed. at p. 858] (italics added), see also *Quercia* v. *United States* (1933) 289 U.S. 466, 469 [77 L.Ed. 1321, 1325, 53 S.Ct. 698].)

 Accordingly, we have made clear that the trial court has broad latitude in fair commentary, so long as it does not effectively control the verdict. For example, it is settled that the court need not confine itself to neutral, bland, and colorless summaries, but may focus critically on particular evidence, expressing views about its persuasiveness. (*Friend, supra,* 50 Cal.2d at p. 577; *DeMoss, supra,* 4 Cal.2d at pp. 476-477.) As Justice Kaus noted in his *Cook* dissent, there is no reason to suppose that this privilege evaporates precisely at the moment when it may be most helpful—when the jury, by requesting aid or announcing impasse, has revealed it is having difficulties with which the court may be able to assist. (33 Cal.3d at p. 415.)

There seems considerable merit in the further observation of Justice Kaus, an experienced trial judge, that "the difference in coercive effect between postdeadlock intervention and predeliberation comment is more apparent than real. In most cases early comment—if it has any effect—simply avoids a deadlock from arising in the first place." (*Id.,* at p. 414.)

*Cook*'s analogy to *Gainer* also misses the mark. A principal flaw in the *Allen* charge at issue in *Gainer* was that, by counseling minority jurors to

consider the majority view, whatever it might be, the instruction encouraged jurors to abandon a focus on the evidence as the basis of their verdict. By contrast, fair comment specifically urges a proper attention to the evidence and its value. Moreover, the *Allen* charge, though buttressed by tradition, did not enjoy the express constitutional sanction conferred on the judicial privilege of fair comment.

The setting of *Cook* well illustrates how extreme facts can produce dubious law. Cook was charged with threatening a witness. The prosecution's case rested entirely on an evaluation of Cook's credibility against that of the alleged victim and her 10-year-old daughter, who claimed she had overheard the threat. After more than a day of deliberations, the jury announced deadlock but acknowledged it might be able to reach a verdict if it knew the judge's views on the credibility of the prosecution witnesses. The court obliged, explaining at length why it believed they were telling the truth while Cook was lying, *and that it therefore thought Cook guilty.* After only 14 more minutes of deliberation, the jury returned a guilty verdict. As *Cook* held—and we affirm—the trial court's commentary would have been improper at any time, since it included the judge's opinion of guilt. (33 Cal.3d at pp. 412-413.)

Though offered as the principal basis for reversal of Cook's conviction, the "deadlock" rule announced in his case was thus superfluous to the facts presented there. And *Cook*'s facts supply little justification for a blanket rule which entirely denies the constitutional privilege of comment once the jury has announced an impasse.

The *Cook* majority relied on an early federal decision which condemned comment "as to . . . guilt or innocence" to a deadlocked jury (*Foster* v. *United States* (4th Cir. 1911) 188 Fed. 305, 309), noting that this rule had been superseded by a "more far-reaching" federal doctrine prohibiting any comment on guilt except where the evidence is undisputed (*United States* v. *Murdock* (1933) 290 U.S. 389, 394 [78 L.Ed. 381, 385, 54 S.Ct. 223]). (33 Cal.3d at p. 410, and fn. 10.) Neither federal decision suggests that *milder* comment is forbidden at any stage.

The majority in *Cook* also emphasized two California Court of Appeal cases, *People* v. *Moore, supra,* 40 Cal.App.3d 56, and *People* v. *Flores, supra,* 17 Cal.App.3d 579. In each, the trial judge recalled the jury after deliberations had begun and provided extensive commentary. In one instance, the court misstated and distorted the evidence; in the other, he based his opinion of guilt on disbelief of the defendant's testimony.

The Courts of Appeal in *Moore* and *Flores* were faced with our pre-*Cook* rule that the trial court could comment on guilt or innocence, so long as it

gave a fair and accurate evidentiary basis for its conclusion and did not undermine defendant's entire case by an attack on his credibility. (See *Brock, supra,* 66 Cal.2d at pp. 655-656; *Friend, supra,* 50 Cal.2d at p. 578.) In each case, the appellate court concluded that the trial court had transgressed these guidelines and usurped the factfinding function of a deliberating jury.

*Moore* and *Flores* provide some support for the notion that commentary should be more carefully scrutinized when given to a jury which has begun deliberations. But neither decision remotely suggests that all comment to a deadlocked panel is forbidden. The holdings of both cases have been superseded by *Cook*'s salutary blanket rule that the judge may never comment on guilt or innocence.

The *Cook* majority implied that its "deadlock" rule was a prophylactic designed to forestall even *potential* undue influence upon a split jury. However, we doubt courts may apply such potent preventive medicine against a privilege expressly endorsed by our Constitution. When countervailing constitutional principles are at stake, we must tread carefully, intruding on the one no further than is necessary to sustain the other.

We are persuaded that *Cook* was wrongly decided insofar as it forbids all judicial comment on the evidence to a deadlocked jury. We overrule *Cook* to that extent.

Of course, appellate courts still must evaluate the propriety of judicial comment on a case-by-case basis, noting whether the peculiar content and circumstances of the court's remarks deprived the accused of his right to trial by jury. (E.g., *People* v. *Scott* (1960) 53 Cal.2d 558, 564 [2 Cal.Rptr. 274, 348 P.2d 882]; *Flores, supra,* 17 Cal.App.3d at p. 585.) Certainly we would not take the risk that one or more members of a deadlocked jury were influenced to reconsider their views or abandon reasonable doubts by judicial comments which had not been "rigorously scrutinize[d]" for "scrupulous" fairness. (See *Cook, supra,* 33 Cal.3d at p. 415 [dis. opn. of Richardson, J.].)[9] In that spirit, we address appellant's alternative claim—that the court's comments in this case were flawed in content.

### 3. *Claimed Error in Content of Trial Court's Comments on Evidence*

(17a) Appellant urges that the first supplemental charge exceeded the trial court's power of comment because it was distorted and biased in favor

---

[9]It seems fairly certain that the first supplemental charge, delivered on February 10, did have an effect on the impasse which had developed on February 8 and 9. As noted, on February 13, the jury advised the court that "[i]nstructions regarding our requests for reading of testimony relative to time helped our deliberations considerably. . . ." The jury thus sought further comment on the testimony of motorists who passed the murder scene, and on the relevance of jurors' personal instincts about witness credibility.

of the prosecution. The text of the charge is set out in the margin.[10] Appellant contends that the charge (1) erroneously instructed the jury not to "single out" testimony of Hawthorne favorable to him and (2) emphasized weaknesses in the Hawthorne testimony favorable to him while ignoring parallel weaknesses in the prosecution's case.

---

[10]The following text of the first supplemental charge reflects the corrections in the reporter's transcript stipulated to in a letter signed by counsel for both parties and received by our clerk on April 24, 1985.

"Ladies and gentlemen of the jury, from the request of the jurors for the reading of testimony, it appears to the court that the question of the time that the defendant and Klaess left Crockett for Sacramento is a matter of controversy among you. You are, of course, the exclusive judges of the facts, and it is your exclusive duty, if you can, to arrive at a verdict, one way or another. To that end, I am going to exercise the privilege that I have under the laws of the state to comment on the evidence. Not to impose my will on you in any way, but simply to isolate what issues may be of relevance. Much of the testimony you have requested has, in some way, dealt with the issue of time. You have, in particular, requested the testimony of two witnesses, Jeri Engel and Wanda Hawthorne, twice, where that testimony pertained solely to the time element. The testimony of Katie Kibbee, Wayne Madison, Wanda Hawthorne, Jeri Engel and Joseph Berger regarding time may be found by you to support either innocence or guilt, or, on the other hand, may be found by you to be of little weight due to the circumstances of the witnesses' observations and the other factors affecting their credibility.

"In addition to the other instructions regarding credibility, which the court has given you in considering what weight to give to these witnesses concerning time, you may wish to keep two additional things in mind. First, most of the witnesses are giving time estimates within a range, such estimates may or may not be accurate and, therefore, may or may not be determinative of the ultimate issues before you. Secondly, as the testimony regarding time may not be determinative, you should keep in mind all of the evidence bearing on the issues before you and not necessarily single out any one piece of evidence. As you have singled out the testimony of Wanda Hawthorne for re-reading twice, you may wish to decide whether her testimony that she left San Francisco at 1:30 a.m., the same time that the defendant said he left Crockett, and that the Camaro came from behind her is accurate. As she said, she was more sure of her time of leaving San Francisco than her arrival time, or whether her estimates of seeing a Camaro near Vacaville at about 2:00 a.m. and of arriving home at about 4:00 a.m. are more accurate. You should also consider whether or not you believe from the evidence that the car that Wanda Hawthorne saw was the defendant's car, and if so, the effect, if any, of her testimony that she did not see that car again.

"Now, again, you are the exclusive judges of the facts. My comments have been intended to be advisory only and are not binding on you as you are the exclusive judges of the questions of fact submitted to you and of the credibility of the witnesses. You should disregard any and all of my comments to you if they do not agree with your views of the evidence and the credibility of the witnesses.

"I also remind you again that both the people and the defendant are entitled to the individual opinion of each juror. It is the duty of each of you to consider the evidence for the purpose of arriving at a verdict, if you can do so. Each of you must decide the case for yourself, but should do so only after a discussion of the evidence and instructions with the other jurors. You should not hesitate to change an opinion if you are convinced it is erroneous. However, you should not be influenced to decide any question in a particular way because a majority of the jurors, or any of them, favor such a decision, and when you are discussing and deliberating, remember too that you are not partisans or advocates in this matter, but you are judges, and I now ask you to return to the jury room, keeping these instructions in mind, together with all of the other instructions that I have given you; continue your deliberations and attempt to reach a verdict, if you can."

As we have suggested, "a trial court that chooses to comment to the jury must be extremely careful to exercise its power 'with wisdom and restraint and with a view to protecting the rights of the defendant.' [Citations.] The court's comments must be scrupulously fair and may not invade the province of the jury as the exclusive trier of fact. [Citation.]" (*Cook, supra,* 33 Cal.3d at p. 408.)

Appellant argues that the charge to "keep in mind all of the evidence bearing on the issues before you and not necessarily single out any one piece of evidence" was erroneous as applied to the Hawthorne testimony. He points out that the cautionary injunction to review all the pertinent testimony before finding a fact to be proved by the testimony of a single witness applies only to a finding in favor of the party having the burden of proof, usually the prosecution. (See *People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 885 [123 Cal.Rptr. 119, 538 P.2d 247]; Evid. Code, § 411.)

The supplemental charge, however, advised the jury to "not *necessarily* single out any one piece of evidence" (fn. 10, *ante,* italics added) and thus did not make review of the other pertinent testimony an absolute prerequisite to reliance on a single witness. The tentative nature of the advice was emphasized by the introduction: "In addition to the other instructions . . . you *may* wish to keep two additional things in mind. . . ." (Fn. 10, *ante,* italics added.) The jury had been properly instructed on the propriety of giving weight to a lesser number of witnesses (CALJIC No. 2.22) and on consideration of a single witness's testimony as proof of a fact "required to be established by the prosecution" (CALJIC No. 2.27). The substance of this comment was within the court's constitutional power.

Appellant also complains that the supplemental charge unduly emphasized weaknesses in the testimony of Hawthorne, which was favorable to the defense, while failing to refer to similar defects in the testimony of Jeri Engel, whose testimony on the time issue tended to favor the prosecution and had also been read to the jury. But the only weakness specified as to Engel is her admission that her testimony as to time was based on general estimates, some of which were directly contradicted by the estimates of defense witnesses Madison and Kibbee. The court's comment covered that problem by stating: "[M]ost of the witnesses are giving time estimates within a range, such estimates may or may not be accurate and, therefore, may or may not be determinative of the ultimate issues before you." (Fn. 10, *ante.*)

On the other hand, the relationship between Hawthorne's and defendant's "time" testimony presented more complex issues which the court was entitled to explore. If Hawthorne was most certain she left San Fran-

cisco at 1:30 a.m., it is unlikely she arrived in Vacaville, over 50 miles away, by 2 a.m., as she testified, especially since she had received a speeding ticket some time during the evening. Moreover, if, as defendant stated, 1:30 was also the time he and Klaess left Crockett, a point almost halfway between San Francisco and Vacaville, it is unlikely his car met Hawthorne's near Vacaville at around 2 a.m., as he theorizes. The court's comment fairly and accurately noted these inconsistencies. (See also discussion *post,* at p. 774, fn. 13.)

"[A] judge may restrict his comments to portions of the evidence or to the credibility of a single witness and need not sum up all the testimony, both favorable and unfavorable. [Citations.]" (*Friend, supra,* 50 Cal.2d at p. 578.) It would be an intolerable burden on trial courts, and thus on the privilege of comment, to require the judge, if he wished to discuss particular evidence, to place it in exact context with all other testimony even remotely related, or to recite meticulously all possible inferences which might be drawn from conflicting evidence.

Here the trial court discussed the strength and relevance of Hawthorne's testimony in greater detail than that of other witnesses, but he placed his remarks in fair perspective.[11] He never suggested he thought Hawthorne was lying or that he believed the evidence proved appellant's guilt. (Compare *Cook, supra.*) His commentary focused on one circumstantial piece of a complex puzzle, and he cautioned as much.[12] He reminded the jurors at length that they were the sole factfinders and that each

---

[11]As noted, the court truthfully observed that Hawthorne was more sure of some times estimates than others, and that the times at which she did or did not see a brown Camaro on the freeway did not necessarily support or undermine either party's case. As the People point out, the court thus merely reminded the jury not to accord Hawthorne's testimony more than its *maximum* worth, or to ascribe to it more accuracy than the *witness herself* would claim.

[12]Appellant suggests that the court should not have provided such a one-sided criticism of Hawthorne's testimony, since, if the jury believed her, it must necessarily have reasonable doubts about his guilt. The legal premise is doubtful; in any event, appellant assigns more materiality to her evidence than it intrinsically deserves. As the trial court stated, her claim that an unidentified brown Camaro followed her from Vacaville to Davis between 2 o'clock and 2:45 is not necessarily inconsistent with appellant's presence at the Harbor Boulevard offramp between 3:35 and 3:40. Hawthorne also stated she arrived home around 4 o'clock but never saw the Camaro again once it finally passed her near Davis. Appellant implies that, if so, she must have passed the murder scene near the critical moment without noticing a car she would surely have recognized. Of course, the night was foggy, and Hawthorne was never asked, nor did she say, whether she noticed *anything* amiss as she passed the Harbor Boulevard exit. There is no necessary inference that the Camaro remained ahead of Hawthorne's car, or that Hawthorne passed the murder scene at a relevant time.

must draw his own conclusions about the case. We conclude that the court's remarks fell within the scope of the constitutional privilege.[13]

### 4. *Denial of Mistrial After Jury's Last Statement It Was Deadlocked*

 Appellant contends it was error to deny the defense motion for mistrial after the jury's note of February 18 that it was "hopelessly deadlocked." That was the 18th court day after commencement of deliberations and the 11th day after substitution of an alternate juror. The jury had already sent the court four other expressions of impasse, and had received three supplemental charges.

The court's response to the note of February 18 was to ascertain the ballots taken and the numerical division (without indication of direction) and to instruct the jury to continue deliberations. During the next three

---

[13]The first supplemental charge, as given, was the last of five drafts prepared by the prosecution and discussed at length, both on and off the record. Appellant complains that the trial court first appeared to agree with defense counsel that language in a *fourth* draft was better balanced, but then improperly reversed position and rejected all proposed modifications to the fifth draft. The claim is overblown, and no error appears in the court's final decision.

Defense counsel did urge that the fifth draft, if given at all, should be supplemented by a specific reference to the discrepancy between Jeri Engel's time testimony, favorable to the prosecution, and that of defense witnesses Kibbee, Madison, Hawthorne, and appellant himself. The court rebuffed this suggestion at all stages, deeming it partisan advocacy. The resulting comment was not improper. As we have explained, the court was not limited by strict notions of "balance" to a bland, colorless summary of all the evidence on the time issue. Nor was it obliged to recite all possible inferences from the time evidence. If fair and accurate, it could provide a critical analysis of particular testimony to which one or more jurors had attached obvious importance.

Counsel also objected to the form of the sentence which declared that Hawthorne was more sure of her 1:30 a.m. departure time from San Francisco, "the same time that the defendant said he left Crockett," than of the estimated times she was followed by a brown Camaro between Vacaville and Davis (around 2 a.m.) or arrived home in Sacramento without seeing the Camaro again (about 4 a.m.). Counsel urged that the quoted phrase unduly denigrated appellant's alibi by implying that his car and Hawthorne's were unlikely to have met if they simultaneously left for Sacramento from San Francisco and Crockett, respectively, and that if the two vehicles did converge, it was probably because appellant actually left Crockett at a later time more consistent with the prosecution theory. Counsel asserted that the district attorney was trying to inject an argument he had forgotten during his final remarks to the jury, and counsel asked that the reference to *appellant's* departure time be deleted.

At first the court expressed sympathy with this request, but over the course of protracted discussion, it had a conscious change of heart. The court came to the opinion that deletion of the reminder about appellant's claimed departure time would *undermine* his alibi. Defense counsel's assessment of the effect of the disputed language seems more accurate. But the comment finally given was proper for that very reason. As noted, it *accurately* highlighted an important internal weakness in the pro-defense implications of Hawthorne's testimony.

Finally, we are not persuaded by appellant's suggestion that judicial comments may never be drafted by counsel. The careful scrutiny given the Hawthorne comment by this trial judge negates any inference that the constitutional privilege was abused.

court days, the jury requested the reading of testimony of five witnesses. The day after that, it returned its verdict.

Section 1140 provides: "Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties, entered upon the minutes, or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree."

The determination whether there is reasonable probability of agreement rests in the sound discretion of the trial court. (*People* v. *Rojas* (1975) 15 Cal.3d 540, 546 [125 Cal.Rptr. 357, 542 P.2d 229].) The court must exercise its power, however, without coercion of the jury, so as to avoid displacing the jury's independent judgment "in favor of considerations of compromise and expediency." (*People* v. *Carter* (1968) 68 Cal.2d 810, 817 [69 Cal.Rptr. 297, 442 P.2d 353].) Appellant contends the verdict was coerced in violation of that principle.

Coercion has been found where the trial court, by insisting on further deliberations, expressed an opinion that a verdict should be reached. (*People* v. *Crossland* (1960) 182 Cal.App.2d 117, 119 [5 Cal.Rptr. 781]; *People* v. *Crowley* (1950) 101 Cal.App.2d 71, 75 [224 P.2d 748].) Though the court here told the jury nothing to that effect, appellant argues that such an opinion was implied by the court's refusal to discharge the jury in the face of the jury's repeated reports of impasse. In cases such as *Crossland* and *Crowley*, however, the trials had been relatively short and the issues relatively simple, so that further deliberations seemed unnecessary for purposes of enabling the jury to understand the evidence and could only be deemed intended to coerce the minority into joining the majority jurors' views of the case.

Here the trial had been long, the evidence voluminous, and the issues complex. Deliberations had been punctuated by the reading of testimony and three supplemental charges to aid the jury in its task. Under the circumstances, the trial judge could reasonably conclude that his direction of further deliberations would be perceived as a means of enabling the jurors to enhance their understanding of the case rather than as mere pressure to reach a verdict on the basis of matters already discussed and considered. (See *People* v. *Tarantino* (1955) 45 Cal.2d 590, 600 [290 P.2d 505].) Subsequent events bore out that conclusion, for on the next three days following the jury's final statement of deadlock, it requested, and was read, five portions of testimony that had not previously been read to it during deliberations. Thus, the deliberations remained "properly focused on the

evidence" (*People* v. *Barraza* (1979) 23 Cal.3d 675, 684-685 [153 Cal.Rptr. 459, 591 P.2d 947]).

Appellant also relies on determinations of coercion based on threats to lock up the jury, or to prolong its deliberations indefinitely. (See *Carter, supra,* 68 Cal.2d at pp. 817-819; *People* v. *Talkington* (1935) 8 Cal.App.2d 75, 85 [47 P.2d 368].) No such coercion occurred here.

Appellant contends that after the court learned the jury was divided 11 to 1, an order for further deliberations must have been construed as pressure on the minority juror. But the practice of inquiring into the jury's numerical division, without finding out how many are for conviction and how many for acquittal, was expressly approved in *Carter.* (68 Cal.2d at p. 815.)[14]

Appellant criticizes the court for not questioning individual jurors on the probability of agreement. (See *id.*, at p. 815.) Though some such questioning may be required to establish legal necessity for discharging the jury (*Rojas, supra,* 15 Cal.3d at p. 546; *Paulson* v. *Superior Court* (1962) 58

---

[14]As appellant notes, *Brasfield* v. *United States* (1926) 272 U.S. 448 [71 L.Ed. 345, 47 S.Ct. 135], concluded that inquiry into the jury's numerical division is inherently coercive and thus reversible per se in federal courts, even where the number for conviction and acquittal is not requested or revealed. Subsequent federal decisions make clear that *Brasfield* is a rule of procedure not binding on the states. (E.g., *Williams* v. *Parke* (6th Cir. 1984) 741 F.2d 847, 851, cert. den. (1985) 470 U.S. 1029 [84 L.Ed.2d 787, 105 S.Ct. 1399]; *Locks* v. *Sumner* (9th Cir. 1983) 703 F.2d 403, 406, cert. den. (1983) 464 U.S. 933 [78 L.Ed.2d 307, 104 S.Ct. 338]; *United States* ex rel. *Kirk* v. *Director, Dept. of Corrections* (7th Cir. 1982) 678 F.2d 723, 725-727.) Courts in other jurisdictions have split on the propriety of such inquiry. (Compare, e.g., *State* v. *Roberts* (1982) 131 Ariz. 513 [642 P.2d 858, 860]; *State* v. *Rickerson* (1981) 95 N.M. 666 [625 P.2d 1183, 1184-1185], cert. den. (1981) 454 U.S. 845 [70 L.Ed.2d 132, 102 S.Ct. 161]; *Dunford* v. *State* (Okla. 1980) 614 P.2d 1115, 1118; *White* v. *State* (1979) 95 Nev. 881 [603 P.2d 1063, 1065]; with *People* v. *Wilson* (1973) 390 Mich. 689 [213 N.W.2d 193], *Kersey* v. *State* (Tenn. 1975) 525 S.W.2d 139, 141.)

In approving numerical-division inquiries, this court's *Carter* opinion did not mention *Brasfield.* Appellant urges that the California rule affirmed in *Carter* stems from a misstatement of *Brasfield* in an early Court of Appeal decision, *People* v. *Talkington, supra,* 8 Cal.App.2d 75. *Talkington,* the first pre-*Carter* California case to discuss *Brasfield,* cited it for the proposition that an inquiry on numerical division is improperly coercive only if the count for conviction and acquittal is sought. (8 Cal.App.2d at p. 84.) No subsequent decision, including those cited in *Carter,* noted the error. However, *Talkington* and later cases implicitly acknowledged a split of authority. In *Carter,* this court relied heavily on the California statute which gives the trial court "responsibility of assuring that a verdict is rendered 'unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree.' (Pen. Code, § 1140.)" (68 Cal.2d at p. 815.)

We remain persuaded, as in *Carter,* that a neutral inquiry into numerical division, properly used, is an important tool in ascertaining the probability of agreement. As noted, there is no convincing evidence of coercion here. The jury's numerical division was requested and revealed on February 18. Thereafter the jury requested and heard substantial additional testimony, and continued deliberations, for four more court days.

Cal.2d 1, 7-8 [22 Cal.Rptr. 649, 372 P.2d 641]), it is not a prerequisite to denial of a motion for mistrial.

## II. PENALTY PHASE

### A. *Constitutional Challenges to 1978 Death Penalty Initiative*

The charged murders occurred on December 22, 1978. Hence, this case is governed by the Briggs death penalty initiative, adopted by the voters in November 1978 to supplant the Legislature's 1977 death penalty statute. Under both the 1977 and 1978 versions of sections 190.1 and 190.2, a defendant becomes eligible for the death penalty only if the jury first convicts him of first degree murder and also finds one or more "special circumstances" to be true. If that occurs, the case proceeds to a separate penalty trial. There the sentencer must consider enumerated "aggravating and mitigating circumstances" in choosing between the penalties of death or life without parole. (Current and former § 190.3.) The 1978 law contains an additional provision that the sentencer "shall" impose the death penalty if it determines that aggravating circumstances "outweigh" mitigating and "shall" impose life without parole if it finds that mitigating circumstances "outweigh" aggravating. (Current § 190.3.)

■ Appellant argues that the 1978 law lacks certain procedural safeguards essential to a constitutional capital sentencing scheme. The statute is invalid, he claims, because it does not distinguish which factors are aggravating and which are mitigating and does not exclude nonstatutory, unspecified aggravating factors as a basis for the death penalty. Further, appellant urges, the law is unconstitutional because it fails to require (1) written findings as to the aggravating factors supporting a death judgment, (2) proof beyond a reasonable doubt of any such aggravating factors, (3) jury unanimity on the dispositive aggravating factors, (4) a finding that aggravating factors outweigh mitigating beyond a reasonable doubt, (5) a finding beyond a reasonable doubt that death is the appropriate penalty, and (6) appellate proportionality review.

Most of these challenges were rejected as to the 1977 law in *People* v. *Jackson* (1980) 28 Cal.3d 264, 315-317, 318-319 [168 Cal.Rptr. 603, 618 P.2d 149], cert. den. (1981) 450 U.S. 1035 [68 L.Ed.2d 232, 101 S.Ct. 1750]; and *People* v. *Frierson* (1979) 25 Cal.3d 142, 176-184, 195-196 [158 Cal.Rptr. 281, 599 P.2d 587]. The prevailing opinions noted that three features of the 1977 statute provided adequate safeguards against arbitrary death judgments and ensured the "guided" sentencing discretion required by the Eighth Amendment. First, the statute made a defendant eligible for the death penalty only if he was first found guilty of first degree

murder and the jury also agreed beyond a reasonable doubt upon the truth of at least one statutory "special circumstance." Second, the law specified the criteria the sentencer should then evaluate in selecting a penalty. Third, it established independent review of each death judgment both by the trial judge and on automatic appeal. The 1978 statute is similar in all relevant respects.

Subsequent United States Supreme Court decisions confirm that a death penalty law avoids the Eighth Amendment's proscription of "arbitrary" sentencing procedures if it suitably narrows the class of death-eligible persons, then provides for an individualized penalty determination at the sentencing and appeal stages. (*Pulley* v. *Harris* (1984) 465 U.S. 37, 53-54 [79 L.Ed.2d 29, 42-43, 104 S.Ct. 871]; *California* v. *Ramos* (1983) 463 U.S. 992, 1008 [77 L.Ed.2d 1171, 1185, 103 S.Ct. 3446]; *Zant* v. *Stephens* (1983) 462 U.S. 862, 876-880 [77 L.Ed.2d 235, 249-252, 103 S.Ct. 2733].) The court has upheld both the 1977 and 1978 California statutes on this basis.

In *Pulley,* the court concluded, for reasons like those specified in *Jackson* and *Frierson,* that the 1977 law met constitutional standards of narrow death eligibility, individualized sentencing, and appellate oversight. Hence, the court held, the statute was not invalid because it lacked provision for review of sentence proportionality. (465 U.S. at pp. 51-53 [79 L.Ed.2d at pp. 40-42].)

In *Ramos,* the majority rejected a claim that the 1978 law was unconstitutional because it required the sentencing jury to be told of the Governor's power to commute a life sentence (the so-called Briggs Instruction) but provided no guidance on how the sentencer was to evaluate this information. "As we held in *Zant* . . .," the majority said, "the constitutional prohibition on arbitrary and capricious capital sentencing determinations is not violated by a capital sentencing 'scheme that permits the jury to exercise *unbridled discretion* in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty by statute.' [Citation.]" (463 U.S. at p. 1009, fn. 22 [77 L.Ed.2d at pp. 1185-1186], italics added.) In other words, the 1978 California law would not contravene the Eighth Amendment even if it set *no* standards for the sentencing of defendants already deemed death-eligible.[15]

---

[15]On remand from the United States Supreme Court, we concluded that the Briggs Instruction violated *state due process* standards. We held that the instruction misled the penalty jury with a "half-truth" (i.e., it concealed the fact that a death sentence may also be commuted) and invited consideration of matters both speculative and irrelevant to the sentencing determination. Hence, it denied a capital defendant a "fundamentally fair decision-making process." (*People* v. *Ramos* (1984) 37 Cal.3d 136, 153-159 [207 Cal.Rptr. 800, 689 P.2d 430].) For reasons explained in the text, we are not persuaded that the procedural devices urged by defendant here are similarly necessary for fundamental fairness.

The 1978 initiative, unlike its 1977 counterpart, provides that the sentencer "shall" impose death if it finds that aggravating circumstances "outweigh" mitigating and "shall" impose life without parole if mitigating circumstances "outweigh" aggravating. This difference warrants no change in the rulings of *Frierson* and *Jackson*. As we explained in *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440], the sentencing function is inherently moral and normative, not factual; the sentencer's power and discretion under both the 1978 and 1977 provisions is to decide the appropriate penalty for the particular offense and offender under all the relevant circumstances. (Pp. 540-545.) Because we recognized that the 1978 language might cause confusion, *Brown* includes a requirement that in all future penalty trials under the 1978 law, the jury must be fully advised of the nature and scope of its sentencing discretion. (P. 545, at fn. 17.)[16]

We are confident that no jury so instructed will mistake the solemnity of its task. Moreover, instructions like those discussed in *Brown* are better suited to the normative task of sentencing than are admonitions, such as those urged by appellant, which speak in terms associated with traditional factfinding. We conclude that the 1978 statute is not invalid on the grounds appellant cites.[17]

B. *Constitutionality of Special Circumstance That Defendant Intentionally Killed One He Knew or Reasonably Should Have Known Was an On-duty Peace Officer (§ 190.2, subd. (a)(7))*

Appellant asserts that a defendant may not constitutionally be found eligible for the death penalty merely because he "reasonably should have known" (§ 190.2, subd. (a)(7)) that the victim of his intentional killing was a peace officer engaged in the performance of official duty. Instead, appellant argues, only those who *actually know* the victim is an on-duty peace officer may constitutionally be found eligible for death because only by so classifying the death-eligible pool can the state constitu-

---

[16]In *Brown*, we expressly reserved judgment as to the validity of pre-*Brown* penalty trials where juries had been instructed only in the literal language of the 1978 law, without further elaboration. We cautioned that we would examine individually each still-pending case in that category to determine whether, under all the circumstances, it appeared likely the jury had been misled to defendant's prejudice about the nature and scope of its sentencing discretion. (P. 545, at fn. 17.) Here, however, the jury was *not* instructed in the 1978 language; rather, it received a modified penalty instruction based on the language of the *1977* statute. (See discussion, *post.*) This instruction implied no limitation on the jury's power to decide the appropriate penalty. Hence, there was no prejudice of the kind identified in *Brown*.

[17]In *People* v. *Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782], we ruled that the 1978 statute precludes introduction at the penalty phase of aggravating evidence which is unrelated to a factor expressly set forth in section 190.3. (Pp. 772-776.) Appellant makes no claim that such impermissible evidence was introduced at his penalty trial. Indeed, the prosecution presented no new evidence at the penalty phase.

tionally distinguish between first degree murderers who are, and those who are not, eligible for death.

In this case, the special circumstance of multiple murder (§ 190.2, subd. (a)(3)) was also found true, and appellant raises no challenge to the validity of at least one multiple-murder finding. (But see section F, *post.*) Hence, he cannot claim he was invalidly made eligible for the death penalty insofar as the jury failed to find he actually knew he was killing peace officers. However, the jury was told, under standard penalty-phase instructions (CALJIC No. 8.84.1) applying section 190.3, that it should consider each special circumstance found true as an aggravating factor at the penalty phase. If the "reasonable-knowledge" standard in the peace-officer special circumstance is unconstitutional, the risk arises that the jury, during the penalty phase, improperly considered as aggravation that appellant reasonably should have known his victims were peace officers regardless of whether he actually had such knowledge. Therefore, appellant's challenge to this special circumstance is not moot.

The primary issue is whether the 1978 statute, and particularly the "reasonable knowledge" feature of the peace-officer special circumstance, provides a "principled way to distinguish this case" (*Godfrey* v. *Georgia* (1980) 446 U.S. 420, 433 [64 L.Ed.2d 398, 409, 100 S.Ct. 1759]) from other first degree murders.

 The cruel and unusual punishment clause of the Eighth Amendment is directed, in part, "'against all punishments which, by their excessive length or severity, are greatly disproportionate to the offenses charged.'" (*Weems* v. *United States* (1910) 217 U.S. 349, 371 [54 L.Ed. 793, 800, 30 S.Ct. 544], quoting *O'Neil* v. *Vermont* (1892) 144 U.S. 323, 339-340 [36 L.Ed. 450, 458, 12 S.Ct. 693].) What constitutes "excessive severity" is to be measured in light of the "two principal social purposes: *retribution* and *deterrence* of capital crimes by prospective offenders" (*Gregg* v. *Georgia* (1976) 428 U.S. 153, 183 [49 L.Ed.2d 859, 880, 96 S.Ct. 2909], italics added) that the death penalty is designed to serve. "Unless the death penalty when applied [to a defendant] measurably contributes to *one or both* of these goals, it 'is nothing more than the purposeless and needless imposition of pain and suffering,' and hence an unconstitutional punishment." (*Enmund* v. *Florida* (1982) 458 U.S. 782, 798 [73 L.Ed.2d 1140, 1152, 102 S.Ct. 3368], italics added.)

Therefore, our analysis of the peace-officer special circumstance must rest on the relationship between a defendant's criminal negligence with respect to knowledge of the officer's status, and either retribution or deterrence or both.

To fulfill the retributive goal, imposition of the death penalty "must be tailored to [the defendant's] personal responsibility and moral guilt." (*Id.*, at p. 801 [73 L.Ed.2d at p. 1154].) Would sentencing defendant to death because he should have known his victim was a peace officer "measurably contribute to the retributive end of ensuring that the criminal gets his just desserts" (*ibid.*)?

The electorate could reasonably conclude that it would. The provision in question gives effect to the special outrage that characteristically arises from the intentional murder of persons acting in certain official public safety capacities. Society considers such killings especially serious for several reasons. The community abhors the human cost to these especially endangered officers and their families, "who regularly must risk their lives in order to guard the safety of other persons and property." (*Roberts* v. *Louisiana* (1976) 431 U.S. 633, 636 [52 L.Ed.2d 637, 641, 97 S.Ct. 1993].) Murders of this kind threaten the community at large by hindering the completion of vital public safety tasks; they evince a particular contempt for law and government, and they strike at the heart of a system of ordered liberty. Applying longstanding values, the electorate may reasonably conclude that an intentional murderer increases his culpability, already great, when he kills one whom he knew or should have known was a police officer performing his duties.

The electorate could also reasonably determine that the goal of deterrence would be served by the statutory provision. We find the commentary to the Model Penal Code's discussion of the justification for criminal liability based on criminal negligence to be illuminating here: "When people have knowledge that conviction and sentence, not to speak of punishment, may follow conduct that inadvertently creates improper risk, they are supplied with an additional motive to take care before acting, to use their faculties and draw on their experience in gauging the potentialities of contemplated conduct. To some extent, at least, this motive may promote awareness and thus be effective as a measure of control. Moreover, moral defect can properly be imputed to instances where the defendant acts out of insensitivity to the interests of other people, and not merely out of an intellectual failure to grasp them. In any event legislators act on these assumptions in a host of situations, and it would be dogmatic to assert that they are wholly wrong." (Model Pen. Code, § 2.02, com. at p. 243.)

We conclude the statutory provision violates neither the Eighth nor Fourteenth Amendments, nor the California Constitution.[18]

---

[18]We recognize the possibility that the retributive goal *might not* be measurably advanced with respect to a defendant who suffered *non-self-induced* "diminished capacity." There-

Appellant also suggests the statute is vague and overbroad because the word "reasonable" does not provide "an ascertainable and fixed standard of guilt." The only basis on which this argument might have merit is in its suggestion that the standard is so amorphous that it gives the jury unbridled discretion in determining who will be exposed to the death penalty. In essence, appellant suggests the court had a sua sponte duty to instruct as to the meaning of "reasonably should have known."

This argument rests on the premise that without such an instruction each juror will necessarily apply his own conception of what is reasonable under the circumstances—a state of affairs that would allow into the deliberative process the very arbitrariness and uncertainty sought to be shielded against by the United States Supreme Court in *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726], and subsequent decisions.

This argument is troubling only if one believes the average juror is unable to ascertain and apply the meaning of "reasonably should have known" in the instruction reiterating the statutory language. We doubt this is the case. First, any instruction elaborating on the term "reasonable" would add little, if anything, to the understanding of most jurors.[19] Moreover, the average juror has the ability to cull from everyday experience a standard by which to assess the ability of a defendant to know the status of his or her victim. It is true that to an extent each juror's life experiences have differed from the experiences of others, and as a result a variety of perspectives on what reasonable knowledge means in a particular fact situation will enter into the deliberative process. But this is also true when a jury must take into account the facts of each murder in determining the egregiousness of a defendant's conduct, and the facts of mitigation, under the death penalty statute. We conclude the challenged statutory provision violates neither the federal nor the state Constitution.

C. *Failure to Instruct Under 1978 Law on Weighing of Aggravating and Mitigating Factors*

■■■ The final paragraph of section 190.3 of the 1978 law provides: "After having heard and received all of the evidence, and after having

fore, although the record here would not have called for such an instruction, we do not foreclose the contention that in appropriate cases it would be proper for the court to instruct that a defendant may not be found guilty of the special circumstance at issue here (even if he reasonably should have known his victim was a peace officer engaged in the performance of his duty) if, by reason of *non-self-induced* "diminished capacity," defendant was *unable actually to know* the status of his victim.

[19]Such an instruction could do little more than inform the jury that "'reasonable' means 'what an average person of average intelligence would have known under the circumstances.'"

heard and considered the arguments of counsel, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances. If the trier of fact determines that the mitigating circumstances outweigh the aggravating circumstances the trier of fact shall impose a sentence of confinement in state prison for a term of life without the possibility of parole."

Appellant's jury, however, was not instructed in this language. The only instruction given concerning consideration of aggravating and mitigating circumstances was one that was modeled after the *1977* death penalty law. Though appellant's case was governed by the 1978 law (see discussion, *ante*), the modified "1977" instruction was approved by both the prosecutor and appellant's trial counsel. It read as follows: "It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on the Defendant. [¶] After having heard and considered all of the evidence and after having heard and considered the arguments of Counsel, you shall consider, take into account, and be guided by, all of the applicable factors of aggravating and mitigating circumstances upon which I have instructed you."

Appellant now contends he was prejudiced by the court's failure to charge the jury, in 1978-law terms, that it should return a death verdict only if it concluded that the aggravating factors outweighed the mitigating factors. Under the instruction actually given, argues appellant, the jury may have imposed the death sentence without reaching that conclusion.

The prejudice, if any, was insubstantial. In *People* v. *Easley, supra,* 34 Cal.3d 858, we reversed the death penalty judgment of a defendant subject to the 1977 law because of error in instructing under the 1978 law that the jury was required to return a death verdict if it concluded that the aggravating circumstances outweighed the mitigating circumstances. As we noted, the Attorney General there argued "that the error did not prejudice Easley and may have even benefitted him. The argument relie[d] on the fact that whereas under the 1977 law the jury could return a death penalty without regard to the relative weight of aggravating and mitigating circumstances, the 1978 law permits a death sentence *only* if the jury finds that aggravation outweighs mitigation." (*Id.,* at p. 883, italics in original.) Although we found it unnecessary to reach the merits of that argument, we observed: "The benefit provided by the requirement that the jury impose a sentence of life without possibility of parole whenever it finds that mitigation outweighs aggravation may well be more theoretical than real. It is difficult to believe that, under the discretion afforded by the 1977

provision, a jury that felt that mitigating circumstances outweighed aggravating circumstances would nonetheless have returned a death sentence." (*Id.*, at p. 884, fn. 18.)

Subsequently, in *Brown, supra,* we explained that the sentencer's function under both the 1977 and 1978 laws is to decide for itself the appropriate penalty under all the relevant aggravating and mitigating circumstances, and that future penalty trials under the 1978 statute must include instructions to that effect. (40 Cal.3d at pp. 542-545, fn. 17.) It is inconceivable that the jury would have been any less likely to return its death verdict if it had been instructed as required by *Brown* instead of being given the instruction of which appellant complains. We see no "substantial" prejudice warranting reversal. (*People* v. *Robertson* (1982) 33 Cal.3d 21, 54, 63 [188 Cal.Rptr. 77, 655 P.2d 279].)

D. *Instructions to Disregard Pity; Failure to Instruct Jury to Consider All Mitigating Character Evidence*

 Appellant contends he is entitled to reversal of the penalty verdict on the ground that the jury was instructed to ignore sympathy at the penalty phase of the trial. He also urges that he was prejudiced by a failure to instruct the jury that it should consider all evidence he offered in mitigation of penalty, even if unrelated to the capital crime.

The penalty phase instructions as such did not refer to sympathy or pity. But those instructions included the following statements at the outset: "The instructions previously given on witness credibility and on assessing the evidence will not be repeated at this time. However, you are to apply the same considerations in assessing the evidence and the credibility of witnesses who testified in the penalty phase as you applied to the witnesses who testified and the evidence in the guilt phase."

At the guilt phase, the trial court had given most of CALJIC No. 1.00, including the paragraph that begins, "As jurors you must not be influenced by pity for a defendant or by prejudice against him," and goes on to warn against bias against a defendant because of his arrest or trial. The court did not, however, give the final paragraph of CALJIC No. 1.00, which begins, "You must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling."

Under this court's decisions, an instruction *at the penalty phase* not to be influenced by pity or sympathy is erroneous and is generally ground for reversal of a verdict imposing the death penalty. (*Brown, supra,* 40 Cal.3d at pp. 537-538; *People* v. *Lanphear* (1984) 36 Cal.3d 163, 168-169 [203 Cal.Rptr. 122, 680 P.2d 1081]; *Easley, supra,* 34 Cal.3d at p. 875.) This

is *particularly* so where defendant has introduced at the penalty phase "sympathetic" character and background evidence which is constitutionally relevant to the sentence determination. While the obvious purpose of such evidence is to evoke sympathy and compassion, and thus to mitigate the penalty, the jury has expressly been told not to consider it on that basis. In such a case, we cannot say with confidence that the jury properly resolved the ambiguity; there is a substantial likelihood that the jury felt compelled to reject an important element of the penalty defense. Thus, the error is a "substantial" one requiring reversal. (*Lanphear, supra;* see also *Robertson, supra.*)[20]

The situation is otherwise when, as here, the no-sympathy instruction occurs only at the guilt phase. The potential for confusion, while it exists theoretically, is more attenuated. We must therefore examine the record as a whole to determine whether an abstract possibility of prejudice may actually have been realized. (Cf., *Brown, supra,* 40 Cal.3d at pp. 542-545, fn. 17.) In this case, we are persuaded that the evidence heard by the jury at the penalty phase, coupled with the prosecutor's ensuing argument, sufficiently conveyed to them the propriety of considering the sympathy factor in deciding on the penalty.

The prosecution presented no new evidence at the penalty phase. The defense evidence at that phase consisted principally of testimony by members of defendant's family and close associates describing constructive aspects of his background, expressing regard for him, and asking that his life be spared. In the argument that followed, the prosecutor discussed seriatim the factors to be considered in fixing the penalty, set out in section 190.3. When he reached factor (k) ("[a]ny other circumstance which extenuates the gravity of the crime"), he called that factor the "catch-all" which "allowed the evidence that was presented to you by the defense in mitigation." He went on: "Anything else that suggests that the lesser of the two penalties is appropriate, it is here that you have a duty to consider . . . the tragic pleas of [appellant's] family to spare his life. . . . [To the] list of [appellant's] victims must be added his mother, his sister, his cousins, his whole family. . . . Our sympathy goes out to that family."[21]

---

[20]The United States Supreme Court has granted certiorari in *Brown* to consider the propriety of a penalty-phase "no-sympathy" instruction. (*California* v. *Brown,* cert. granted June 2, 1986, — U.S. — [90 L.Ed.2d 717, 106 S.Ct. 2274] (Dock. No. 85-1563).)

[21]The full text of the passage of the prosecutor's argument from which these quotations are taken is as follows: "The final factor is the catch-all. It's the catch-all which has, I believe—the People believe allowed the evidence that was presented to you by the defense in mitigation.

"It says any other circumstances which extenuates the gravity of the crime, even though it is not a legal excuse for the crime.

"Let me talk about that for a minute and then I will come back to the two things I

We conclude that under these circumstances, there is no reasonable possibility that the penalty phase instruction to apply the same considerations by which evidence and credibility were assessed at the guilt phase, coupled with the prior guilt phase admonition not to be influenced by "pity," affected the penalty verdict. Accordingly, these instructions are not grounds for reversal.

Nor was appellant prejudiced by the failure to instruct the jury that it should consider, under factor (k), all evidence appellant offered in mitigation of penalty, whether or not related to the capital crime itself. (See *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 113-114 [71 L.Ed.2d 1, 10-11, 102 S.Ct. 869]; *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604-605 [57 L.Ed.2d 973, 989-990, 98 S.Ct. 2954].) In *Easley, supra,* we announced a prospective requirement that such an "expanded factor (k)" instruction be given. (34 Cal.3d at p. 878, fn. 10.) In *People* v. *Davenport* (1985) 41 Cal.3d 247 [221 Cal.Rptr. 794, 710 P.2d 861], we ruled that omission of such an instruction in a pre-*Easley* trial was grounds for reversal if prejudicial. (Pp. 282-286.) Under *Davenport,* the assessment of prejudice encompasses "the totality of the penalty instructions given and the nature of the arguments made to the jury," in order to determine whether "there is a reasonable possibility the penalty verdict was affected" by the instructional deficiency. (Pp. 286, 287; see also *Brown, supra,* 40 Cal.3d at p. 545, fn. 17.)

Here, as in *Davenport,* no other instructions given the jury either aggravated or mitigated the misleading effect of the factor (k) instruction. In contrast with *Davenport,* however, the prosecutor in this case took pains to advise the jury of its true responsibility. He declared in no uncertain terms that factor (k) was a "catch-all" which imposed a "duty" on the jury to consider "[a]nything else that suggests . . . the lesser of the two penalties," including the pleas by appellant's family for his life. We see

---

mentioned earlier that I haven't yet talked about, the circumstances of the event and the age of the defendant.

"Anything else that suggests that the lesser of the two penalties between which you must choose is appropriate, it is here that you have a duty to consider what can only be characterized as the tragic pleas of Mr. Rodriguez's family to spare his life.

"I think you will agree with me that after we list the victims in this case who have been killed and robbed, that to that list of victims must be added his mother, his sister, his cousins, his whole family. He has victimized them by reducing them to the point where they must come forward in the face of the evidence in this case and plead for his life.

"Not victims like Mike Freeman and Roy Blecher who are dead, but they are victims, nonetheless. Our sympathy goes out to that family.

"And I think the saddest part of all of that is that what they told you, I am sure, is what they feel that they believe about their brother and their son, but they don't know Luis Rodriguez.

"They don't know him. They don't know the Luis Rodriguez or they can't see the Luis Rodriguez that we have come to know by the evidence in this case."

no reasonable possibility that the jury was misled about the factors relevant to its penalty determination.

E. *Double Counting of Murders as Aggravating Factors Consisting of (A) Circumstances of Crime and (B) Criminal Activity Involving Violence*

 The trial court instructed the jury that in determining the penalty they should consider, take into account, and be guided by the factors listed in section 190.3, subdivisions (a) to (k), which the instructions then set forth. Those factors included "(a) [t]he circumstances of the crime of which the defendant was convicted" and "(b) [t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." Appellant contends that the instructions, as given, erroneously permitted the jury to consider the murders as aggravating factors under both categories.

However, the jury was also instructed that "[i]n the penalty phase you may consider *only* the [evidence of three robberies committed by appellant and Klaess on December 20 and 21] as it bears upon the presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (Italics added.) By thus limiting the evidence to be considered under factor (b), the court precluded consideration of the circumstances of the murders under that factor. Thus the claim of error is without merit.

F. *Double Counting of Multiple-murder Special Circumstances*

 The information charged *two* multiple-murder special circumstances; the murder of Officer Freeman was charged as a multiple murder to the killing of Officer Blecher, and the murder of Officer Blecher was charged as a multiple murder to the killing of Officer Freeman. Both multiple-murder special circumstances were found true. Appellant urges he was thereby prejudiced at the penalty phase, since, under factor (a) of CALJIC No. 8.84.1 and section 190.3, the jury may have separately considered each multiple-murder special circumstance as a separate factor in aggravation.[22]

Finding no legitimate state purpose, and recognizing the danger of prejudice, we have condemned the practice of charging more than one multiple-murder special circumstance in a single information. (*People v. Harris* (1984) 36 Cal.3d 36, 67 [201 Cal.Rptr. 782, 679 P.2d 433].) We must

---

[22]Under factor (a), the jury is to consider in aggravation "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of *any* special circumstances found to be true. . . ." (Italics added.)

nonetheless determine whether the error was "substantial"—i.e., raised a reasonable possibility of prejudice—in this particular penalty trial.

We conclude the double charging was harmless in this case. The jury knew the actual number of murders of which appellant had been convicted, and it was permitted to consider the fact of multiple murder as an aggravating circumstance. We can find possible prejudice only if we think it is reasonably probable the jurors thought the *two murders* more heinous because two *multiple-murder* special circumstances had been charged. Nothing at trial, or in the arguments or instructions, was calculated to create that impression. We find no grounds for reversal.

### G. *Prosecutorial Comments on Appellant's Age*

CALJIC No. 8.84.1 advises the jury, in determining penalty, to consider the aggravating and mitigating circumstances listed in section 190.3, including "[t]he age of the defendant at the time of the crime." In his closing remarks, the prosecutor had said: "[A]ppellant's age is a factor. He was 23 years old at the time of these offenses. He was old enough to know better. He was old enough to be a productive member of our society. He was old enough to know that he need not be a social anarchist, which I think the evidence shows him to be. He was old enough to kill." Appellant contends these comments were prejudicial misconduct, since they suggested that his age was an aggravating factor, though age can only be a circumstance in mitigation.

We note at the outset that a "misconduct" claim is misplaced, because appellant failed to object to the prosecutor's argument, and an admonition to the jury would have cured any prejudice. (*People* v. *Ramos* (1982) 30 Cal.3d 553, 576 [180 Cal.Rptr. 266, 639 P.2d 908]; *People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468].) In any event, we are convinced the prosecutor's remarks were permissible argument which did not mislead the jury.

In *Davenport, supra,* we indicated it is improper to instruct or argue that the absence of evidence of a statutory mitigating factor is itself aggravating on the issue of penalty. As we explained, the purpose of "aggravating" and "mitigating" factors is to assess the seriousness of a capital crime in relation to others of the same general character. The mere absence of a mitigating element may weigh against a finding that the instant offense is less serious than "normal," and thus especially deserving of mercy, but it does not suggest that the crime is *more* serious than "normal," and thus especially deserving of death. Indeed, "[s]everal of the statutory mitigating factors are particularly unlikely to be present in a

given case . . . . To permit consideration of the absence of these factors as aggravating circumstances would make these aggravating circumstances automatically applicable to most murders." (41 Cal.3d at p. 289.)

We agree, as appellant suggests, that mere chronological age, a factor over which one can exercise no control, should not of itself be deemed an *aggravating* factor. ■ However, the sentencing jury is entitled to know that a defendant's crime *lacks* certain elements the state deems relevant to *leniency* in the choice of penalty. Thus, we see no impropriety in prosecutorial argument that a defendant is *less deserving of leniency* (as opposed to more deserving of death) than a younger, perhaps less sophisticated offender.

The argument challenged here was thus within permissible bounds. It suggested only that appellant, like all adults, was fully responsible for his criminal acts and thus not deserving of the special deference to youthful impulsiveness. It did not declare affirmatively that appellant's chronological maturity weighed in favor of the death penalty, rather than life without parole. We conclude that the instant argument did not contravene *Davenport*.

## H. *Prosecutorial Comments on Absence of Belief in Moral Justification*

■ Among the penalty factors, aggravating and mitigating, which the jury was told to consider under section 190.3 and CALJIC No. 8.84.1 is "[w]hether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct." Before the jury was so instructed, the prosecutor made the following statements in his closing argument: "The next factor is equally meaningless. It provides a contrast, I think, to the kind of situation you might have in this case, but you don't have and that factor is whether or not the offense was committed under circumstances where the defendant reasonably believed—which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

"The absence of that factor, the absence of that factor speaks loudly. The absence of the slightest bit of moral justification or extenuation, the absence of a shred of evidence of that strangulates what might be a factor that mitigates, that speaks in the defendant's favor, that cries out against his conduct."

Appellant claims that while a reasonable belief in moral justification is a mitigating factor, the absence of such belief is not a factor in aggrava-

tion. Hence, he asserts, the prosecutor's comment violated *Davenport, supra,* by representing the absence of a mitigating circumstance as an aggravating one.

Again, we note that appellant's failure to object to the challenged remarks obviates a claim of prosecutorial misconduct. (*Green, supra,* 27 Cal.3d at p. 27.) In any event, we are persuaded that the comments did not contravene the principles of *Davenport.*

We did suggest in *Davenport* that the "moral justification" factor is among those which can only mitigate. Because a belief in moral justification is usually lacking, we noted, its absence would otherwise become an automatic aggravating circumstance in most murders. (41 Cal.3d at p. 289.)

But here, as in his comments on age, the prosecutor did no more than suggest the *inapplicability* of a *mitigating* factor. He first declared that the lack-of-moral-justification evidence made that factor "meaningless." In a subsequent sentence he altered his semantic course, urging that this absence "speaks loudly," but his meaning became clear as he proceeded. The lack of moral justification, he said, "strangulates" a *mitigating* factor, one that "speaks in defendant's favor" and "cries out against his conduct."[23]

Never did the prosecutor say or imply that the absence of evidence on moral justification was a factor in *aggravation,* or that it tipped the penalty balance toward death. We do not believe his remarks, fairly construed, carried any significant danger of misleading the jury in that respect. We see no grounds for reversal.

I. *Prosecutorial Comment on "Shotgun Incident" Not Relied on as Aggravating "Other Violent Crime" in People's Case-in-chief on Penalty; Failure to Give "Reasonable Doubt" Instruction as to "Shotgun Incident"*

As "other violent crimes" in aggravation of penalty (see § 190.3, subd. (b)), the prosecutor agreed to rely solely on guilt-phase evidence of the three uncharged robberies in Davis, San Francisco, and San Rafael on December 20 and 21, 1978. In accordance with *People v. Robertson, supra,* 33 Cal.3d 21, the jury was instructed not to consider these three crimes in aggravation unless it found them true beyond a reasonable doubt.

---

[23]In the context of this sentence, the words "one that cries out against his conduct" cannot have meant that the absence of moral justification evidence *condemns* appellant's conduct or makes it more blameworthy than the normal murder. Here, "cries out against his conduct" must have meant, and been understood to mean, that moral justification evidence, if present, might have "cried out" *against* the *seriousness* of his offense. Even if there was some ambiguity in this passing phrase, we do not deem it serious enough to create a reasonable possibility that the jury was misled to appellant's prejudice on the issue of penalty.

In his closing argument, however, the prosecutor referred to the November 1978 incident in which appellant had supposedly reached for a shotgun in his back seat when stopped by a police officer. The prosecutor suggested this was additional evidence of appellant's lawlessness. Appellant urges the prosecutor's remarks breached his agreement on "other crimes," and were thus misconduct. The resulting prejudice, appellant claims, was magnified by the fact that the jury received no "reasonable doubt" instruction on the shotgun incident.

Again, appellant's argument is compromised by his failure to object. In any event, it lacks merit. In *People v. Boyd, supra,* 38 Cal.3d 762, we held that the People may not, in their case-in-chief on penalty, introduce bad-character evidence unless it bears upon one of the aggravating factors expressly listed in section 190.3. However, we noted, if the defense thereafter presents mitigating character evidence under "expanded factor (k)," "prosecution rebuttal evidence would be admissible as evidence tending to 'disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.)" (Pp. 775-776.)

Thus, under *Boyd,* by placing his character in issue, a defendant widens the scope of admissible *bad*-character evidence and argument. The theory for permitting such rebuttal evidence and argument is not that it proves a statutory aggravating factor, but that it *undermines* defendant's claim that his *good* character weighs in favor of mercy. Accordingly, the prosecutor, when making such a rebuttal effort, is not bound by the listed aggravating factors or by his statutory pretrial notice of aggravating evidence. (§ 190.3.)

Here the prosecutor, true to his notice, introduced no new penalty evidence during the People's case-in-chief. Subsequently, appellant offered substantial evidence and argument that he was a kind, loving, contributive member of his community, regarded with affection by neighbors and family. Once appellant placed his general character in issue, the prosecutor was entitled to rebut with evidence or argument suggesting a more balanced picture of his personality.

Nor, we conclude, is it critical that no new "reasonable doubt" instruction was given to cover the prosecutor's reference to the shotgun incident. In *Robertson, supra,* we affirmed that where uncharged *crimes* are to be weighed, as such, in aggravation of penalty, a reasonable doubt factfinding standard is "vital" to proper consideration of this special category of aggravating evidence. (33 Cal.3d at pp. 53-54; see *People* v. *Stanworth* (1969) 71 Cal.2d 820, 841 [80 Cal.Rptr. 49, 457 P.2d 889]; see also *People* v. *McClellan* (1969) 71 Cal.2d 793, 804-806 [80 Cal.Rptr. 31, 457 P.2d 871].) Implicit is the notion that the People may not obtain the death

penalty on the basis of uncharged criminal activity proved by a standard less stringent than would be required to convict the defendant of the uncharged crime.

However, when evidence or argument about defendant's past acts is offered merely to rebut a good-character defense, it is irrelevant whether the bad conduct in issue contained all, or any, of the elements of a criminal offense. The evidence is offered not for its *criminal* character but for its *antisocial* character. In upholding the prosecutor's reference to the shotgun incident, we do not and need not decide what violent felonies or misdemeanors, if any, were committed. Nor was the jury required to make any such determination. Hence, the "reasonable-doubt" standard which applies specially to proof of crimes is inapplicable.[24]

J. *Failure to Make Independent Determination and to State Reasons for Findings in Ruling on Automatic Motion for Modification of Penalty Verdict*

Finally, appellant contends the judgment of death must be vacated because the trial court failed to exercise all of its responsibilities under section 190.4, subdivision (e). That subdivision provides that after a verdict imposing the death penalty, the defendant shall be deemed to have applied for modification of the verdict under section 1181, subdivision 7.[25] "In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings." (§ 190.4, subd. (e).)

The trial court's ruling on appellant's automatic application for modification was as follows: "Having considered the arguments of counsel and

---

[24]Nothing in our discussion is meant to imply that *any* evidence introduced by defendant of his "good character" will open the door to *any and all* "bad character" evidence the prosecution can dredge up. As in other cases, the scope of rebuttal must be specific, and evidence presented or argued as rebuttal must relate directly to a particular incident or character trait defendant offers in his own behalf. Here, for example, appellant presented evidence through family members that he was gentle and in the habit of avoiding violent confrontations. The prosecutor's reference to the "shotgun incident" was thus proper rebuttal to this specific asserted aspect of appellant's personality.

[25]Section 190.4, subdivision (e), literally refers to an application for modification under "Subdivision 7 of Section 11." Section 11, however, deals only with military courts martial and with the power to punish for contempt, and contains no subdivision 7. Section 1181, subdivision 7, deals with modification of verdicts, was referred to by a similar provision in the 1977 version of section 190.4, subdivision (e) (now repealed), and is specified in the penultimate sentence of present section 190.4, subdivision (e). Accordingly, we conclude that the reference to section 11 was an inadvertent error and construe it as a reference to section 1181.

having considered all of the evidence received in the matter, and having considered, taken into account and being guided by the aggravating and mitigating circumstances referred to in Penal Code Section 190.3, the Court finds that the aggravating circumstances outweigh the mitigating circumstances and that the weight of the evidence supports the jury's verdict of death. [¶] Accordingly, defendant's motion for modification of the jury's verdict of death must be, and hereby is, denied."

Appellant claims two fatal defects in this ruling. One is that the trial court assertedly did not make an independent determination of the propriety of the verdict under the law. The other is that the court failed to "state on the record the reasons for his findings." (§ 190.4, subd. (e).)

It is not apparent from the face of the court's ruling whether or to what extent the ruling was based on an *independent* review of the weight of the evidence. Just before announcing his ruling in open court, however, the trial judge stated he would "not make factual findings because I believe that Briggs [the 1978 death penalty statute] ties the hands of the court . . . . I'm not suggesting what I would do if I had the right of independent determination." Similar remarks by the judge appear earlier in the record. He relied on the fact that the 1977 version of section 190.4, subdivision (e), provided that the judge should "make an independent determination as to whether the weight of the evidence supports the jury's findings and verdicts." The 1978 version, now in effect, omits the word "independent."

We think that the present version of section 190.4, subdivision (e), like the 1977 version, requires that the trial judge make an independent determination whether imposition of the death penalty upon the defendant is proper in light of the relevant evidence and the applicable law. One reason for this interpretation is that it harmonizes section 190.4, subdivision (e), with section 1181, subdivision 7, to which subdivision (e) refers. Subdivision 7 of section 1181 was adopted in 1951. In ruling on motions under that subdivision for modification of verdicts that called for the death penalty under former sections 190 and 190.1, which were in effect up to 1972, "the trial judge ha[d] the duty to review the evidence to determine whether in his independent judgment the weight of the evidence support[ed] the jury's verdict, and if he decide[d] it d[id] not, he ha[d] the power to reduce the penalty to life imprisonment." (*In re Anderson* (1968) 69 Cal.2d 613, 623 [73 Cal.Rptr. 21, 447 P.2d 117].) Moreover, in determining whether in his or her independent judgment the weight of the evidence supported the verdict, the judge was required to assess the credibility of the witnesses, determine the probative force of the testimony, and weigh the evidence. (*People* v. *Love* (1961) 56 Cal.2d 720, 728 [16 Cal.Rptr. 777, 366 P.2d 33].) By providing for automatic review of a death verdict

under section 1181, subdivision 7, section 190.4, subdivision (e), must have intended that the trial judge exercise the responsibilities for independent review imposed by subdivision 7, notwithstanding the omission of the word "independent" that appeared in the 1977 version of section 190.4, subdivision (e).

Moreover, if subdivision (e) were construed as precluding independent review of the death verdict by the trial judge, questions of federal constitutionality might arise. (See *Frierson, supra,* 25 Cal.3d at pp. 178-179.)[26]

 The trial judge's ruling was therefore deficient because it appears from the record to have been based on an erroneously narrow view of the scope of his powers and responsibilities under sections 190.4, subdivision (e) and 1181, subdivision 7.

The ruling also was deficient for its failure to specify reasons for denying modification sufficient "to assure thoughtful and effective appellate review." (*Frierson, supra,* 25 Cal.3d at p. 179.)[27]

 We conclude that the deficiencies in the disposition of appellant's automatic application to modify the penalty verdict constitute the only grounds for reversal. Accordingly, while the penalty judgment must be vacated, there is no reason to order a new penalty trial. Rather, we may simply remand with directions to the trial court to reconsider and rule on the verdict-modification application in accordance with our opinion. (§ 1260; *Love, supra,* 56 Cal.2d at p. 729.)

### III. CONCLUSION

The judgment is affirmed in all respects, except that the judgment of death is vacated and the cause remanded to the trial court solely for prompt reconsideration of appellant's automatic application for modification of the death verdict (§ 190.4, subd. (e)) under the standards set forth in this opinion. If, after applying such standards, the court again denies the ap-

---

[26]The briefs of both parties indicate that at the hearing on the automatic application for modification of the penalty verdict, the prosecutor took the position that the court was required to make an "independent review" of the verdict. Though the prosecutor did use such language, he also stated that even under the 1977 death penalty law, the judge was not called upon to reweigh the evidence. "Deukmejian [the 1977 law] never told you to independently reweigh. It says to make a determination *as to whether the weight of the evidence supports the jury's findings,* and there is a difference."

[27]Section 190.4, subdivision (e), provides that denial of modification of the verdict is reviewable on the defendant's automatic appeal (§ 1239, subd. (b)) and that the granting of modification "shall be reviewed on the People's appeal pursuant to paragraph (6)." We construe "paragraph (6)" to refer to section 1238, subdivision (a)(6), which expressly permits a People's appeal from "[a]n order modifying the verdict or finding by reducing . . . the punishment imposed . . . ."

plication for modification of verdict, it shall reinstate the judgment of death. If it grants the application, it shall modify the judgment to reflect a penalty of life without possibility of parole. Defendant's appeal from any reinstated death judgment shall be automatic (§§ 190.4, subd. (e), 1239, subd. (b)) and limited to issues arising on the modification application. The People shall have an appeal, similarly limited, from any modified penalty judgment (§§ 190.4, subd. (e), 1238, subd. (a)(6)).

Reynoso, J., Panelli, J., and Lucas, J., concurred.

**MOSK, J.**—I dissent.

As I shall explain, the trial court committed a serious error in violation of the rule of *People* v. *Cook* (1983) 33 Cal.3d 400 [189 Cal.Rptr. 159, 658 P.2d 86], by delivering a comment on the evidence after the jury had reached a deadlock in deliberations that spanned 34 days. I cannot join the majority in their disregard of the doctrine of stare decisis and their consequent overruling of *Cook*. The trial court committed another serious error because the comment delivered was unfair, and I cannot join the majority in their specious assertion that it was innocuous. Because neither error can be deemed harmless on this record, the judgment should be reversed as a miscarriage of justice. (Cal. Const., art. VI, § 13.)

I

A

A core of facts relating to the case was not in serious dispute at trial.

At 3:36 a.m. on December 22, 1978, California Highway Patrol Officers Freeman and Blecher were shot to death on the shoulder of the eastbound lanes of Interstate Highway 80 in West Sacramento after they evidently made a traffic stop. Blecher suffered one wound, a fatal shot to the head; his hands were cuffed behind his back. Freeman received five shots: one in the right arm, one in the left shoulder, two in the back of the bulletproof vest he was wearing, and one—which was fatal—to the head. All the bullets could have been fired from a Smith and Wesson .38 caliber Model 67—the revolver issued to all California Highway Patrol officers—as well as from the kind of Smith and Wesson .38 caliber revolver available to the general public. The bullet Blecher received in his head and the bullet Freeman received in his left shoulder came from the same gun; the four other bullets Freeman received came from another gun. Blecher was physically robust, Freeman exceptionally so.

Found at the scene was a Smith and Wesson .38 caliber revolver that Blecher carried in an ankle holster as a backup weapon; it had not fired any of the bullets that struck the officers. Also found were a Hi-Standard .22 caliber revolver—which was similar to a weapon defendant was seen carrying the day before the killings; a footprint made by a Famolare brand shoe—defendant was wearing Famolares when he was arrested; and a temporary driver's license in the name of Anthony Peter Carlo—which defendant had obtained on the day before the killings. Defendant's fingerprints, however, were not on the .22 caliber revolver, Blecher's backup gun, the cuffs that secured his hands, or any other item. The murder weapons were never recovered. At the time of the killings, defendant was apparently about five feet seven inches in height and one hundred forty-five pounds in weight.

One crucial fact was in dispute from the beginning of the trial to its very end: the identity of the person or persons who killed Blecher and Freeman.

The prosecution sought to prove that defendant was the killer. Simply stated, its version of what happened was as follows: defendant was driving in excess of the speed limit from the home of Jeri Engel in Crockett to his room at the Bel Air Motel in West Sacramento; Blecher and Freeman pulled him over; defendant singlehandedly disarmed the officers, handcuffed Blecher, and killed both of them with their own weapons.

The principal evidentiary support for this theory came from Margaret Klaess. She testified that she met defendant in January 1978 and lived with him intermittently thereafter; about the end of November they moved into the Bel Air Motel in West Sacramento; shortly afterwards they were arrested by the Richmond police and defendant's panel truck was impounded.

On December 20, Klaess continued, they began hitchhiking from West Sacramento to Richmond; they wanted to secure the release of the truck and intended to get the money they needed to pay the impoundment charges through robbery; on the evening of that day a man picked them up outside Davis; after defendant pulled a gun, they robbed the driver of his wallet and his truck and forced him out of the vehicle; they then drove to Richmond where they abandoned the truck and spent the night in a motel.

The next day, Klaess went on, they were driven by a friend from Richmond to Vallejo, where defendant obtained a temporary driver's license in the name of Anthony Peter Carlo; the pair then went to a used car lot and made off in a Volkswagen under the pretext of taking it for a test drive; they proceeded to another used car lot, abandoned the Volkswagen, and absconded with a 1977 dark brown Camaro under the same pretext.

Afterwards, Klaess continued, they drove to San Francisco, selected a house at random, and robbed the occupant, defendant demanding his money at gunpoint; they then went to Sausalito and came across a prostitute, Teresa Frechette; they offered her a ride and she accepted; coming to a stop in an industrial area of San Rafael, they robbed her, defendant forcing her to hand over her money and jewelry at the point of a gun and she (Klaess) rifling her purse; they forced the woman out of the car and sped off.

That night, Klaess went on, after buying some 151 proof rum, they arrived at the house Engel and her boyfriend shared in Crockett; after a while defendant and Engel went to a local bar where defendant bought some cocaine; back at Engel's house defendant shared the cocaine with her and with Engel and her boyfriend; about 2:30 a.m. they left Crockett for West Sacramento.

After leaving that area, Klaess continued, she and defendant traveled east on Route 80 in the brown Camaro, heading for their motel in West Sacramento; defendant was driving faster than the other cars on the road; as they neared West Sacramento, at a locale 56 miles distant from Engel's house, they were pulled over by a police unit; the police car stopped behind their vehicle on the shoulder of the freeway; an officer appeared at the window on the driver's side and, after about 20 seconds, asked defendant to get out of the car; she remained in the front passenger's seat; a minute or two later she heard a shot ring out from behind her; she immediately turned and saw a police officer lying on the ground moaning; promptly after she heard the shot, defendant appeared at the driver's side, opened the door, leaned in, and said he could not find the license; he did not have anything in his hands; he then left the car for a second time; immediately she heard a second shot, followed within two or three seconds by several others; some 30 seconds later, defendant returned and said repeatedly he could not find the license or the gun; again she saw nothing in his hands; he then left the car for a third time and returned in about 20 or 30 seconds with the officers' two guns; she had remained in the car throughout the incident.

She and defendant, Klaess went on, then drove the Camaro off the freeway and abandoned it near some apartments; the officers' guns were in her handbag; they walked along some railroad tracks, slid down an embankment, crossed a field where they hid from a hovering police helicopter, and eventually worked their way back to their room at the Bel Air Motel; she assisted defendant in placing the police guns in a dumpster which she believed was behind the motel.

Later, Klaess continued, defendant told her that he had pulled a gun on one of the officers when he turned his back, fought with both men, and

handcuffed one of them and shot him in the head—and did it because he did not want to go to jail again.

To support Klaess' testimony on the critical point of the time the pair departed from Crockett, the prosecution called Engel, who testified in substance as follows: on December 21, 1978, defendant and Klaess arrived at the house she shared with her boyfriend about 11 p.m.; Klaess appeared intoxicated; the four began to drink some rum that the visitors had brought with them; some time later, defendant asked her to buy some cocaine for him; at first she refused but then agreed to go to a nearby bar, called the Club Tac, to try to make a purchase; about 1 a.m. defendant drove her to the Club Tac, she bought some cocaine with his money, and the two returned to her house; the four used some cocaine and continued to drink rum, and Klaess became extremely intoxicated; Klaess and defendant left about 2:30 a.m. Engel admitted, however, that the times she gave were all approximate and that her statement that the pair departed about 2:30 a.m. was only a general estimate.

The prosecution also introduced evidence that defendant had been in jail, did not want to return, hated the police, and said he would kill any officer who might interfere with him.

Defendant took the position that it was not he who killed Blecher and Freeman. His defense was three-pronged. First, he offered direct evidence—his own testimony—that he was innocent of the charged crimes, and supported that testimony with corroborative evidence from independent and disinterested witnesses. Second, he attacked the credibility of Klaess, the crucial prosecution witness. Finally, he introduced evidence suggesting the identity of the actual killers.

On the stand defendant testified that he left Sacramento with Klaess on December 20, 1978; he was wearing brown loafers, not the Famolares he also owned; he and Klaess committed three robberies on December 20 and 21, using a .38 caliber gun that Klaess carried in a large leather purse; on December 21, he obtained a temporary driver's license in the name of Anthony Peter Carlo, which Klaess kept in her purse because he did not have a wallet.

He and Klaess, defendant continued, arrived at Engel's home in Crockett at 10:30 p.m. on December 21; he and Engel went to the Club Tac about 11:45 p.m. to buy some cocaine, remained there until midnight, and then returned to Engel's; he and Klaess stayed there using cocaine until 1:30 a.m.; they then left in the Camaro for West Sacramento; he took Route 80 and drove at 60 to 65 miles an hour until he exited from the

freeway in West Sacramento; he stopped the car two and a half blocks from the Bel Air Motel, intending to abandon it; Klaess insisted on getting more cocaine but he refused; Klaess drove off and he walked back to the motel and was in their room by 3 a.m.

He next saw Klaess, defendant went on, at 7:30 a.m. sitting on the floor of their motel room and doing something to her boots; Klaess' pants were in the bathtub, which was filthy with dirt; she said that she had been with some people that night; that they would kill her if she talked about what happened; and that he would have to say she was with him the night before.

Three witnesses corroborated defendant's testimony on the crucial issue of time—i.e., he was in the Club Tac about 12 midnight, not 1 a.m.; he left Engel's at 1:30 a.m., not 2:30 a.m.; and he reached West Sacramento by about 2:30 a.m.

Wayne Madison stated that he was tending bar at the Club Tac on December 21, 1978, and that he saw defendant there between 11 p.m. and 12 midnight. Katie Kibbee testified that she was also at the bar and saw defendant there within the same time period. Wanda Hawthorne stated that about 1:30 a.m. on December 22, 1978, she and a friend set out in her car from San Francisco on their way home to Sacramento; on Route 80 near Vacaville about 2 a.m. she noticed a brown Camaro following her; the Camaro had a driver and one sleeping passenger; she remembered the car because it had been weaving behind and following her closely; after the Camaro passed her, she did not see it again as she proceeded on to Sacramento; nor did she see any police vehicles—for which she was on the lookout, since she had received a ticket earlier that night; she dropped her friend off about 3:45 a.m. and arrived home about 4 a.m. She admitted that the times she stated were approximate and that she was most certain about the time she left San Francisco.

The testimony of Joseph Berger, a defense investigator, undermined the reliability of Engel's statement that defendant and Klaess left her house at 2:30 a.m. He testified that in an interview he conducted after she gave her testimony at trial she said that the pair arrived at her house between 10 p.m. and 11 p.m., that she and defendant returned to her house from the Club Tac by about 12:30 a.m., and that the pair departed about an hour and a half later.

The credibility of Margaret Klaess was severely impeached. First, she admitted at the preliminary hearing that she lied under oath about her history of prostitution simply to avoid personal embarrassment.

Second, her interest in testifying against defendant could not have been greater: her life depended on it. Before she agreed to testify, she faced charges carrying the death penalty. She decided to become a prosecution witness because, in her own words, "I want a life; I don't want to have to deal with going to a gas chamber. I wanted to take care of myself, looked out for myself." In exchange for her testimony and her guilty plea to a charge carrying a maximum sentence of three years, she received immunity not only for the killings, but for all prior crimes.

Third, Klaess had developed a deep hostility towards defendant. While initially confined in jail, she maintained her own innocence and that of defendant, with whom she was in love and whom she wanted to marry. Later a love letter that defendant wrote to another woman was "misdirected" by jail authorities to her cell. On reading the letter she became extremely angry and jealous, called defendant a "motherfucker," swore to make him pay dearly for his unfaithfulness, and decided to testify against him.

Finally, Klaess's testimony that her pants were muddied while avoiding detection by a police helicopter during her return to the Bel Air Motel was impeached by the fact, established beyond dispute at trial, that no helicopter was or could have been in that area on the morning of December 22, 1978.

The defense also offered testimony suggesting that other persons may have been at the crime scene when Blecher and Freeman were slain, among them one Robert Sanchez. In November 1978 Klaess quarreled with defendant and left him. She moved from Crockett, where they had been living, to Sacramento. While there, she stayed with among others Robert Sanchez. Later, when defendant and Klaess reconciled defendant traded a white Ford Galaxie to Sanchez for the latter's panel truck.

Further, several witnesses who passed the highway patrol vehicle about the time of the slayings described seeing a light-colored Ford parked near the unit, one specifically identifying it as a 1968 Ford Galaxie, while others described it as a white car of another make. Several of these witnesses also saw a second civilian car parked at the crime scene at the same time. The prosecution, however, called other passersby to rebut this testimony.

Finally, during one interview with the prosecutor prior to trial, Klaess stated that the .22 caliber revolver found at the crime scene came from Sanchez, although she quickly retracted the assertion during the interview and denied its truth at trial.

### B

On the morning of Friday, January 23, 1981, after the parties had rested and the court had given its charge, the jury began deliberating. Later that

morning they asked to hear the testimony of Margaret Klaess concerning the events that occurred between the time she and defendant picked up Teresa Frechette in Sausalito and the time they left Engel's home in Crockett.

On the morning of Monday, January 26, the jury requested that Engel's testimony be read. On the afternoon of the same day, they asked for the testimony of Wayne Madison.

On Tuesday, January 27, the jury requested the testimony of Wanda Hawthorne.

On Wednesday, January 28, the jury asked for, among other things, a reading of testimony given by defendant, including the portion covering the events that occurred between the encounter with Frechette and the departure from Engel's house.

On Thursday, January 29, the reading that began the previous day continued.

On Friday, January 30, the jury sent a note asking for testimony given by Katie Kibbee and Joseph Berger on the issue of time. The court, however, did not act on the request before the close of day.

On Monday, February 2, the court received information that one of the jurors had been hospitalized and substituted an alternate juror in his place. It then instructed the jurors to disregard their past deliberations and to begin anew and returned the note asking for the testimony of Kibbee and Berger. Later that day, the jury sent the note back to the court and the requested testimony was read.

On Tuesday, February 3, the jury requested Engel's testimony on the amount of time that passed between defendant's return from the Club Tac and his departure for West Sacramento.

On Wednesday, February 4, the jury asked for certain testimony on a variety of issues.

On Thursday, February 5, the jury sent a note to the court: "The jury cannot reach a unanimous verdict as to the guilt or innocence of the defendant, Luis Rodriguez." The court advised them to leave for the day and to resume deliberations the next day.

On Friday, February 6, the jury sent the following note: "2-6-81; Your Honor, one of the jurors would like to hear the complete testimony of Ms.

Hawthorne." The requested testimony was read. Later that day, the jury sent a second note: "Your Honor, the jury cannot agree unanimously as to the guilt or innocence of the defendant Luis Rodriguez." Still later, they sent a third note: "To Judge Karesh, Your Honor, you have instructed us to continue to deliberate. We, the jury, have found ourselves at an impasse, and it's been verbally expressed as final." Defendant unsuccessfully moved for a mistrial. The court ordered the jury to cease deliberations, advised them to return the following Monday morning to continue, and said it would give them further instructions soon after they returned.

On the morning of Monday, February 9, the jury sent the following note: "One of the jurors would like to make a final effort to resolve our impasse with the request that you would hold your final instructions from us." The jury continued their deliberations for about an hour and then sent another note: "Your Honor, the jury is ready for his Honor's instructions." The prosecutor suggested certain comments on the evidence by the court, to which defense counsel objected. Later that day, the court inquired whether the jurors were still deadlocked and was told they were. It then advised them to cease deliberations and to return to court the next morning for further instructions. For a second time defense counsel unsuccessfully moved for a mistrial.

On Tuesday, February 10, the court delivered what the People and defendant refer to as the "Hawthorne Comment," which generally discussed factors the jurors should consider in weighing the testimony on the question of time and then isolated the material points of Hawthorne's testimony and suggested they might wish to scrutinize them for accuracy.[1]

On Wednesday, February 11, the jury asked for written copies of the Hawthorne Comment. Later that day, they sent a note: "The jury cannot come to a unanimous decision as to the innocence or guilt of the defendant, Luis Rodriguez." For a third time defense counsel unsuccessfully moved for a mistrial.

On Friday, February 13—the next court day after Lincoln's Birthday—the court, over defense objection, gave a supplemental charge, in which it reread instructions on such matters as the presumption of innocence, reasonable doubt, the credibility of witnesses, and the duty of each juror to arrive at an independent decision. The jury then sent the court the following note: "Instructions regarding our requests for reading of testimony relative to time helped our deliberations considerably. The jury would now like to hear your instructions regarding the use of testimony of passersby

---

[1] The full text of the Hawthorne Comment appears in footnote 10 of the majority opinion.

who passed the crime scene in the early morning hours of 12-22-78. Also, please give us instructions related to jurors using the 'feelings' and 'beliefs' to justify the credibility of Rodriguez and Klaess' testimony. Please provide a written copy of instructions relative to the aforementioned."

On Tuesday, February 17—the next court day after the President's Day three-day weekend—the court gave another supplemental charge, which was responsive to concerns suggested by the jury's note of February 13.

On the morning of February 18, the jury sent the court the following note: "Your Honor, the jury still cannot come to a unanimous decision as to the innocence or guilt of the defendant. The jury consideres [sic] itself hopelessly deadlocked after the Court's instructions, and to continue deliberations is fruitless." The court stated its intention to instruct the jurors to continue deliberations until lunch and then to ask how many ballots they had taken and the numerical division. Defense counsel opposed any query concerning ballots or numerical division, and for a fourth time moved for a mistrial. The court denied the motion and stated that it would ask the jury to continue deliberations and decide later whether to poll them. That afternoon, the court gave the jury a questionnaire that asked (1) the number of ballots taken, (2) the numerical division on each ballot since February 2—the date the alternate juror was seated—without disclosing which way the division went, and (3) the date of their last ballot. The jury responded that they had taken five ballots since February 2, that the vote had been eleven to one on each, and that the last ballot had been taken on February 11. For a fifth time defense counsel unsuccessfully moved for a mistrial.

On Thursday, February 19, the jury requested certain testimony that related to a gray 1940's-style jacket. Defendant had testified that he was wearing the jacket on December 21 and 22, 1978, had taken it to a dry-cleaning establishment near the Bel Air Motel probably on December 23, 1978, and regained possession of it while in custody. In rebuttal the prosecution called witnesses to undermine the credibility of defendant's testimony on this point. The court instructed the jury not to resume deliberation until told to do so and proceeded to excuse them for the weekend.

On the morning of Monday, February 23, the testimony requested by the jury on February 19 was reread. Later that day the jury asked for other testimony on the issue.

On the morning of February 24, the testimony requested the previous day was reread. The jury then asked to hear the other testimony relating to the jacket.

Finally, on Wednesday, February 25, the jury returned verdicts of guilty on both murders and findings of true on all the special circumstances allegations.

## II

### A

In *People* v. *Cook, supra,* 33 Cal.3d 400, we held that ·"Comment at a time when the jury is deadlocked is so likely to invade the jury's province and control its verdict that such comment *must* be deemed erroneous." (*Id.,* at p. 413, italics added.) We plainly implied that the rule was a prophylactic designed to prevent the trial court from invading the jury's province and thereby to safeguard the right to trial by jury of every person charged with crime.

The need for such a prophylactic rule is clear. First, the injury threatened—violation of the defendant's constitutional right to a jury trial—is great. As the United States Supreme Court reaffirmed in holding that the due process clause of the Fourteenth Amendment makes the Sixth Amendment jury-trial right applicable to the states, "trial by jury in criminal cases is fundamental to the American scheme of justice" (*Duncan* v. *Louisiana* (1968) 391 U.S. 145, 149 [20 L.Ed.2d 491, 496, 88 S.Ct. 1444]).

Second, the risk that this fundamental constitutional right will be violated by such a comment is high.

Under all circumstances, as the United States Supreme Court has observed, "'The influence of the trial judge on the jury is necessarily and properly of great weight,' . . . and jurors are ever watchful of the words that fall from him. Particularly in a criminal trial, the judge's last word is apt to be the decisive word." (*Bollenbach* v. *United States* (1946) 326 U.S. 607, 612 [90 L.Ed. 350, 354, 66 S.Ct. 402].)

When the jurors have reached a deadlock, however, the influence of the judge is greater still: in that event, it is inevitable that the proper resolution of the issue or at least the termination of the proceedings turns largely on what the judge does or says. Moreover, it is precisely when there is an impasse that the judge may be most inclined to make, and the jurors most inclined to be affected by, an unfair comment on the evidence. In such a situation, even the fairest judge is under pressure—which may be imperceptible to all and therefore hard to counteract—to obtain a verdict simply to avoid a mistrial. That the judge in the case at bar felt this pressure is evident. On several occasions during trial he announced to counsel that it

was not his practice to comment on the evidence and that in fact he had never done so. On one occasion, for example, he stated: "I have, under the law of California, the Constitution of California, the Judge has a right to comment on the evidence. I want to advise you now I don't follow that practice. I do not comment upon the evidence. I don't do it. [¶] I let the jury decide facts without any guidance from me as to the facts. I give them the law, but not the facts. How they should treat the evidence, I don't do that. Some judges do, I don't." Despite such statements, when the impasse appeared hopeless the judge did comment on the evidence.

In the face of their own deadlock and the court's refusal to declare a mistrial, even the most responsible jurors are under similar pressure to return a verdict if only to end their deliberations. Under such circumstances, even such a degree of unfairness as would otherwise be de minimis must be deemed substantial: when there is deadlock, the issue is close and the judge may improperly tilt the balance by an otherwise insignificant word said or unsaid, or even by the manner in which he makes his comment.

Third, without the *Cook* rule the danger that the court may invade the jury's province cannot adequately be minimized and the injury flowing from that invasion cannot in all cases be redressed. Whenever the court comments on the evidence, there is a risk that the comment will be unfair, and that an appellate court will be unable to detect its impropriety. The reason is plain: because the fairness of a comment necessarily depends on the peculiar facts of the individual case, it is a difficult and uncertain task for a trial court to find the line between fairness and unfairness as it attempts to fashion its comment, and it is a similarly difficult and uncertain task for an appellate court to review that comment and to offer guidance for comments in future cases. But when the trial court comments on the evidence after the jury has reached a deadlock, the risk that the comment will be unfair and that an appellate court will be unable to detect its impropriety is intolerable: as I have explained, in that event there is unavoidable pressure on the trial court to obtain, and on the jury to return, a verdict solely to end the proceedings, and even such a degree of unfairness as would otherwise be de minimis is substantial.

In this case it is undisputed that the court commented at a time when the jury was deadlocked. It thereby erred under *Cook*.

Evidently recognizing that *Cook* governs this case, the majority are compelled to overrule what they cannot distinguish. I do not doubt their power to do so; I do, however, object to their unjustifiable exercise of that power here.

Under the doctrine of stare decisis, a court should refrain from overruling a rule declared in a prior decision unless that decision is manifestly erroneous and compelling reasons appear. The doctrine has a vital function within our system of jurisprudence. As applicable to this court are the words written by Justice Felix Frankfurter with reference to the United States Supreme Court: "We should not be so unmindful, even when constitutional questions are involved, of the principle of *stare decisis,* by whose circumspect observance the wisdom of this Court as an institution transcending the moment can alone be brought to bear on the difficult problems that confront us." (*Green* v. *United States* (1957) 355 U.S. 184, 215 [2 L.Ed.2d 199, 220, 78 S.Ct. 221].)

As even a cursory review of the majority's discussion reveals, they fail to show *Cook* is erroneous or to give any reasons for overruling that decision. At its foundation the majority's holding is premised on the following assertion: "we doubt courts may apply such potent preventive medicine [as the *Cook* rule] against a privilege expressly endorsed by our Constitution. When countervailing constitutional principles are at stake, we must tread carefully, intruding on the one no further than is necessary to sustain the other." (*Ante,* p. 770.) This assertion, however, is hollow.

To begin with, we applied the *Cook* rule not "against a privilege expressly endorsed by our Constitution" but—as the majority must surely recognize but refuse to admit—against the high risk that post-deadlock comment would effectively invade the jury's province and inflict on the defendant the grievous injury of a violation of his constitutional right to trial by jury.

More important, whatever "intrusion" the *Cook* rule makes is clearly justified. As between the defendant's right to trial by jury and the trial court's "privilege" of comment, the latter plainly must yield to the former. While the "privilege" is of state constitutional dimensions, the jury-trial right is of federal constitutional dimensions and as such is superior. Moreover, whereas the "privilege" is designed to promote efficiency in the administration of justice (*People* v. *Ottey* (1936) 5 Cal.2d 714, 723 [56 P.2d 193]), the jury-trial right is a "fundamental right, essential for preventing miscarriages of justice and for assuring that fair trials are provided for all defendants" (*Duncan* v. *Louisiana, supra,* 391 U.S. at p. 158 [20 L.Ed.2d at p. 501]).

Finally, the *Cook* rule's "intrusion" is, in any event, minimal. In the vast majority of cases the rule has no application at all, because deadlock occurs only rarely. And in the rare cases in which deadlock does occur, the rule merely prohibits comment *after* deadlock. In such cases the court retains the power to comment at any time before deadlock; and in virtual-

ly—if not absolutely—all of them, it can infer from the jury's requests or questions that impasse is possible and hence is put on notice that unless it exercises its power sooner rather than later it may not be able to exercise it at all.

For all these reasons I am compelled to conclude that the majority's overruling of *Cook* is unjustifiable on any ground, and therefore I cannot join in their holding.

### B

Under settled law, when "a trial court . . . chooses to comment to the jury[,] [it] must be extremely careful to exercise its power 'with wisdom and restraint and with a view to protecting the rights of the defendant.' (*People* v. *Shannon* [(1968)] 260 Cal.App.2d [320,] . . . 331 [67 Cal.Rptr. 207]; see also *People* v. *Rincon-Pineda* (1975) 14 Cal.3d 864, 886 [123 Cal.Rptr. 119, 538 P.2d 247, 92 A.L.R.3d 845]; *People* v. *Friend* [(1958)] 50 Cal.2d [570,] . . . 587 [327 P.2d 97]; *People* v. *De Moss* [(1935)] 4 Cal.2d [469,] . . . [4]77 [50 P.2d 1031].) The court's comments must be scrupulously fair and may not invade the province of the jury as the exclusive trier of fact. (*People* v. *Friend, supra,* 50 Cal.2d at pp. 577-578.)" (*People* v. *Cook, supra,* 33 Cal.3d at p. 408.) As will appear, under these principles the court clearly erred in making the Hawthorne Comment.

Before the court delivered this comment, the jury had twice stated without ambiguity that it was deadlocked. The point of dispute was evident—when did defendant leave Crockett and when did he arrive in West Sacramento. The jury had requested rereading of testimony on this issue given by Jeri Engel, Wanda Hawthorne, Wayne Madison, Katie Kibbee, and Joseph Berger—twice with regard to the testimony of Engel and Hawthorne. Engel's testimony generally supported the prosecution's theory of the case, while that given by Madison, Kibbee, Berger, and especially Hawthorne supported defendant's.

After opening with certain general remarks, the court proceeded to make the two specific points that constitute the core of the Hawthorne Comment:

"First, most of the witnesses are giving time estimates within a range, such estimates may or may not be accurate and, therefore, may or may not be determinative of the ultimate issues before you. Secondly, as the testimony regarding time may not be determinative, you should keep in mind all of the evidence bearing on the issues before you and not necessarily single out any one piece of evidence. As you have singled out the testimony of Wanda Hawthorne for re-reading twice, you may wish to decide whether her testimony that she left San Francisco at 1:30 a.m., the same

time that the defendant said he left Crockett, and that the Camaro came from behind her is accurate. As she said, she was more sure of her time of leaving San Francisco than her arrival time, or whether her estimates of seeing a Camaro near Vacaville at about 2:00 a.m. and of arriving home at about 4:00 a.m. are more accurate. You should also consider whether or not you believe from the evidence that the car that Wanda Hawthorne saw was the defendant's car, and if so, the effect, if any, of her testimony that she did not see that car again."

The first point, to be sure, is "scrupulously fair." Not so the second, which overshadows it and deprives it of effect. Both Hawthorne and Engel had admitted to some uncertainty in their estimates of time. Yet in the second point the court suggested that the jury give further specific scrutiny to Hawthorne's testimony—but failed to make a similar suggestion with regard to Engel's.[2]

The majority's attempt to justify the comment is altogether specious. Initially, if the first point, as they claim, adequately addressed the time problem in Engel's testimony and thus obviated the need for further comment, it *must* have done the same as to the time problem in Hawthorne's; the second point, therefore, was unnecessary and served merely to unfairly strengthen the prosecution's case and undermine defendant's. Moreover, contrary to the majority's assertion, Hawthorne's testimony simply did "not present[] more complex issues which the court was entitled to explore" (*ante,* p. 773), and in any event did not justify the unfair comment that the court actually made. Finally, to state, as the majority do, that the trial court may in general restrict its remarks to the testimony of a single witness begs the question: regardless of how many witnesses' testimony it discusses in its comment, the court must always be "scrupulously fair"—and here the court plainly was not.

### C

Under any standard the error committed in this case must be deemed prejudicial. As shown by the substantial evidence presented by each side and confirmed by the long and clearly difficult deliberations—spanning 34 days and producing no fewer than 5 expressions of deadlock—the case was

---

[2]Such a comment might have run as follows: "As you have also singled out the testimony of Jeri Engel for rereading twice, you may wish to decide whether her testimony was accurate on the following points: that she arrived home at 10:30 p.m., that Margaret Klaess and the defendant came by at 11 p.m., that she and the defendant went to the Club Tac at 12:30 a.m. and returned to her house at 1 a.m., and that Margaret Klaess and the defendant left at 2:30 a.m. She said that she had been drinking rum and snorting cocaine in the relevant time period, and that in general she gave only an estimate of when each event happened and did not consult a clock."

extremely close. Moreover, it is evident that the improper comment caused one or more jurors to sacrifice a legitimate belief that Hawthorne's testimony raised a reasonable doubt as to defendant's guilt: after the comment was made, the jury never again asked to hear testimony relating to the time issue and indeed stated that "Instructions regarding our requests for reading of testimony relative to time helped our deliberations considerably." The fact the jury continued at an impasse for two more weeks—evidently attempting to determine whether defendant lied on a point not directly material to guilt or innocence and, therefore, whether he should be distrusted on other points—establishes that had the Hawthorne Comment not been made it is at least reasonably probable that a result more favorable to defendant would have been reached.

A conviction obtained under such circumstances is a miscarriage of justice within the meaning of our Constitution. (Art. VI, § 13.) Defendant is thus entitled to a new trial before a jury not exposed to unfair comment on the part of the court.

Bird, C. J., and Broussard, J., concurred.

Appellant's petition for a rehearing was denied December 31, 1986, and the opinion was modified to read as printed above. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.